## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MARY KEEN KIRCHOFF, M.D.;<br>MICHAL PORUBCIN, M.D.; MICHAEL<br>HAWKING, M.D.; BRIAN COURI, M.D.;<br>MOST REVEREND THOMAS J.<br>PAPROCKI, ROMAN CATHOLIC<br>BISHOP OF THE DIOCESE OF<br>SPRINGFIELD IN ILLINOIS, and<br>LUTHERAN CARE CENTER,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARIO TRETO, JR., Secretary of the<br>Illinois Department of Financial and<br>Professional Regulation and SAMEER<br>VOHRA, Director of the Illinois<br>Department of Public Health, in their<br>official capacities,<br><br>    Defendants. | Case No.: 1:26-cv-9628 |

## COMPLAINT

## INTRODUCTION

1.      Since the third century A.D., doctors have been swearing to "[f]irst, do no harm" as part of their Hippocratic Oath upon entering medical practice. In its original form, that Oath also included the following, directly related promise: "I will not give a lethal drug to anyone if I am asked, ***nor will I advise such a plan***."[1] Likewise, the "well-established" common-law rule recognized that "counsel[ing] another to commit suicide" was the equivalent to "murder,"

---

[1] https://www.congress.gov/117/meeting/house/114995/documents/HHRG-117-IF02-20220719-SD007.pdf (all emphasis throughout this Complaint is added unless otherwise stated).

1

including with respect to "those to whom life ha[d] become a burden—of those who [were] hopelessly diseased or fatally wounded." *Washington v. Glucksberg*, 521 U.S. 702, 714 (1997) (alterations in original) (internal quotation marks omitted).

2. Illinois is on the verge of extinguishing these traditions quite literally overnight. In a volte-face with nearly two millennia of medical practice, Illinois's "End-of-Life Options" Act ("EOLO"), 410 ILCS 22/1, *et seq.*—which takes effect on September 12th—both legalizes assisted suicide *and* mandates that doctors who conscientiously object to it nonetheless promote its alleged "benefits" to "terminally ill" patients and, if requested, refer or transfer those patients to someone who is "able and willing" to help them commit suicide. Doctors also must lie on death certificates by hiding that at least one of the underlying causes of the patient's death was a lethal substance obtained pursuant to EOLO. And they must refrain from giving patients undefined "intentionally misleading" information—ostensibly including the provision of information on available end-of-life treatment options that does *not* include assisted suicide or its supposed "benefits."

3. EOLO imposes similar "benefits"-discussion and referral mandates on objecting health care entities. [2] And these entities are separately required to allow their onsite practitioners to promote and discuss "how to access" resources to obtain assisted suicide while on duty, and to *directly provide* lethal substances while off duty at different locations—no matter how publicly[3] or contrary to their employer's opposition to assisted suicide.

---

[2] Not even the assisted suicide laws of Oregon, Washington, California, and New York require objecting providers to facilitate assisted suicide to the same degree.

[3] For example, 60 Minutes once aired a video of Dr. Kevorkian euthanizing a patient on national television. *See* Overtime Staff, "Dr. Jack Kevorkian's '60 Minutes' interview," June 4, 2011, https://www.cbsnews.com/news/dr-jack-kevorkians-60-minutes-interview/. Under EOLO, a religious health care entity that sincerely objects to any association with assisted suicide cannot restrict its physicians from engaging in similar public promotions of assisted suicide.

4.      Additionally, objecting health care entities must refrain from "deploy[ing]" so-called "misinformation to *obstruct* access to" assisted suicide. Nowhere does EOLO prohibit "misinformation" that *facilitates* access to assisted suicide; nor does it ever define "misinformation." At the same time, EOLO expressly requires that "[a]ctions taken in accordance with this Act do not, for any purposes, constitute suicide" or "assisted suicide." As a result, simply distinguishing "assisted suicide" from ordinary end-of-life palliative care, or counseling patients against choosing "assisted suicide," ostensibly constitutes "misinformation" that "obstructs access" to it under this draconian and wholly *sui generis* restriction.[4]

5.      Plaintiffs include four highly skilled physicians (including two oncologists and two rehabilitation specialists) and a Lutheran skilled nursing facility, none of whom can in good conscience comply. Their basic commitment to preserving patient health, along with their shared Christian faith, compels them to use all reasonable means to *save* life and tell the truth. Accordingly, they sincerely object both morally and religiously to facilitating assisted suicide *in any way*—consistent with the Hippocratic Oath's deeply rooted promises to "do no harm" and refrain from "advis[ing]" patients how to commit suicide. Plaintiffs thus cannot and will not comply with compelled speech mandates to promote the so-called "benefits" of assisted suicide as a legitimate "treatment option" even for "terminally ill" patients or refer them to a third party for the specific purpose of intentionally killing themselves.

6.      EOLO's mandates to this effect—on pain of potentially career-ending civil, administrative, and criminal consequences—put Plaintiffs to the choice of either violating their

---

[4] This is not Illinois' first "misinformation" prohibition. Three years ago, the General Assembly declared certain abortion-related speech by pregnancy help centers with which it disagreed to be "misinformation" and subject to regulation. *See* Public Act 103-0270. That Act was preliminarily enjoined, and later permanently enjoined (by agreement), in *NIFLA v. Raoul*, 685 F. Supp. 3d 688 (N.D. Ill. 2023) & 2023 WL 9325644 (N.D. Ill. 2023).

faith and succumbing to Illinois's new mandates, or abiding their faith and violating state law. As such, EOLO threatens to punish and potentially drive Plaintiffs and other like-minded professionals out of health care in Illinois—to the detriment of innumerable patients both "terminally ill" and otherwise in need of their care, and despite an ongoing physician shortage nationally and in the Land of Lincoln.[5]

7. The two plaintiff oncologists are *especially* likely to be faced with affirmative requests to satisfy Illinois patients' new "rights" under EOLO to doctors' assistance in ending their lives, given the studied reality that most patients who seek assisted suicide have received cancer diagnoses.[6]

8. Plaintiffs also include the Most Reverend Thomas J. Paprocki, Roman Catholic Bishop of the Diocese of Springfield in Illinois. As Bishop, he is charged with enforcing the United States Conference of Catholic Bishops' (USCCB's) *Ethical and Religious Directives for Catholic Health Care Services* ("ERDs")[7] within his Diocese. The ERDs explicitly forbid Catholic health facilities from participating in assisted suicide "in any way" and from providing any referrals for the same. The Diocese of Springfield in Illinois contains two large Catholic hospital systems. Thus, one of Bishop Paprocki's official religious duties is ensuring those hospitals abide by the ERDs' categorical bar on facilitating assisted suicide. By requiring even

---

[5] Cicero Institute, "Illinois Physician Shortage Facts," March 28, 2024, https://ciceroinstitute.org/research/illinois-physician-shortage-facts/.

[6] Gabriela Galvin, "Most people who opt for medically assisted dying around the world have cancer," Euro News, Dec. 9, 2024, https://www.euronews.com/health/2024/12/09/most-people-who-opt-for-medically-assisted-dying-around-the-world-have-cancer; G. Montagna, et al., "Assisted suicide in patients with cancer," ESMO Open, Vol. 7, Issue 1, February 2022, https://pmc.ncbi.nlm.nih.gov/articles/PMC8789521/.

[7] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (7th ed. 2025), https://www.usccb.org/resources/ERDs-7th-ed-Approved_2025-11-12.pdf.

objecting hospitals to discuss assisted suicide's alleged "benefits" and provide referrals for the same, EOLO directly interferes with Bishop Paprocki's internal church governance of Catholic hospitals' ERD-compliance in his diocese.

9.      Illinois's conscription of objecting practitioners into its new assisted suicide regime blatantly violates the First and Fourteenth Amendments. Indeed, EOLO plainly compels or restricts speech based on content and viewpoint by requiring such practitioners to (a) discuss assisted suicide's alleged "benefits" and make specific "referrals" for the same; (b) lie on death certificates by hiding that lethal substances were a cause of the person's death; (c) record in the patient's medical record their request for assisted suicide and the inability to participate, as a trigger for starting the "qualification" process with another practitioner; and (d) refrain from giving patients "misleading" information about one's provision of end-of-life care, and from "deploy[ing]" so-called "*misinformation* to *obstruct* access" to assisted suicide. Each and all of these requirements trigger strict scrutiny under the First Amendment's Free Speech Clause, which they easily fail.

10.     EOLO also violates the First Amendment right of expressive association by forcing health care entities to hire and otherwise associate with health care professionals who promote or even directly participate in assisted suicide.

11.     EOLO additionally violates the First Amendment's protection for the free exercise of religion and church autonomy. Put simply, requiring only a narrow class of "health care professionals" to discuss the "benefits" of and "refer" for assisted suicide with respect only to "terminally ill" patients, contrary to those professionals' deeply held religious beliefs, is neither neutral nor generally applicable. And requiring health care entities to hire and retain employees who promote and even participate in assisted suicide violates the internal governance of religious

5

institutions in deciding whom they authorize to carry out their religious mission to save and promote the dignity of every patient's life.

12. EOLO also violates the Fourteenth Amendment Due Process Clause's bar on undue vagueness—including because its ban on "deploy[ing]" undefined "misinformation" to "obstruct" access to assisted suicide fails to provide adequate notice to both individuals and enforcement authorities about the contours of this wholly undefined prohibition.

13. Although 12 states have previously legalized assisted suicide, none has required objecting practitioners to counsel patients about its alleged "benefits" without any exception. And only a small minority have imposed referral requirements on conscientiously objecting physicians—two of which are being challenged in federal courts now.[8]

14. While Illinois has its own (highly controversial) view of assisted suicide, it has no authority to force that view upon Plaintiffs. And the Supreme Court has made clear time and again that credentialed medical professionals' pure speech has no less First Amendment protection than anyone else's speech.

15. Plaintiffs seek only to continue providing health care in accord with what had long been *required* in law and medicine for thousands of years, and consistent with their religious commitments to avoid cooperating in another person's suicide in any way. Illinois's attempt to now flip that requirement on its head—by commanding even *objecting* practitioners to facilitate assisted suicide—is flagrantly unconstitutional.

---

[8] In addition to this challenge, several orders of Catholic religious sisters filed suit in federal court last month challenging New York's own "referral" and "benefits"-discussion mandates in its newly adopted assisted suicide law. Tyler Arnold, "Bishop Barres, Catholic sisters sue New York over assisted suicide mandates," EWTN News, July 20, 2026, https://www.ewtnnews.com/world/us/sisters-sue-ny-assisted-suicide-mandates.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under the Constitution and laws of the United States.

17.     This Court has authority to issue the relief sought pursuant to 28 U.S.C. §§1343(a), 2201, and 2202, and 42 U.S.C. §§1983 and 1988.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants perform their official duties and maintain offices in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims has occurred or will occur in this District, and Plaintiffs Dr. Mary Keen Kirchoff, Dr. Michael Hawking, and Dr. Brian Couri practice medicine in this District.

**PARTIES**

19.     Plaintiff Dr. Mary Keen Kirchoff is a Catholic physician in Chicago, Illinois, with specialties in pediatric physical medicine and rehabilitation. She regularly treats patients (including adults) with severe disabilities or nearing the end of life as part of her rehabilitation practice. She is also an active member of the Catholic Medical Association and practices medicine in accord with Catholic teaching on assisted suicide and the Catholic ERDs. She cannot cooperate with assisted suicide in any way, including by discussing its alleged "benefits" with patients and making "referrals" for it. Her practice is located in the Eastern Division of the Northern District of Illinois.

20.     Plaintiff Dr. Michal Porubcin is a hematologist oncologist practicing in East Moline, Illinois. He is an active member of the Catholic Medical Association and vice president of his local Catholic Medical Association guild. He follows Catholic teaching on assisted suicide, including the Catholic ERDs. He cannot cooperate with assisted suicide in any way, including by

7

discussing its alleged "benefits" or making "referrals" for it. His practice is located in the Central District of Illinois.

21.     Plaintiff Dr. Michael Hawking is a hematologist, oncologist, and medical professor in Chicago. He regularly treats patients in need of end-of-life care and, as a professor, also participates in panels discussing euthanasia and assisted suicide. He has published scholarship on the experience of legalized euthanasia in Belgium and the Netherlands. He is also a believing Catholic and practices medicine in accord with Catholic teaching and the Catholic ERDs regarding assisted suicide. He too cannot cooperate with assisted suicide in any way, including by discussing its alleged "benefits" with patients and making "referrals" for it. His practice is in the Eastern Division of the Northern District of Illinois.

22.     Plaintiff Dr. Brian Couri is a specialist in physical medicine and rehabilitation. He regularly treats patients (including the elderly) with musculoskeletal and nerve conditions, including back, neck, and joint pain. Dr. Couri is a believing Catholic and practices medicine in accord with Catholic teaching and the Catholic ERDs on assisted suicide. He cannot cooperate with assisted suicide in any way, including by discussing its alleged "benefits" with patients and making referrals for it. His practice is located in the Eastern Division of the Northern District of Illinois.

23.     Plaintiff the Most Reverend Thomas J. Paprocki is the ninth Bishop of the Diocese of Springfield in Illinois. As Bishop, he exercises "legislative, executive, and judicial power within his diocese according to the norm of law."[9] The ERDs provide that diocesan bishops have "ultimate responsibility" to ensure Catholic health care facilities in their dioceses abide the ERDs. Because the ERDs expressly prohibit facilitating assisted suicide (including by

---

[9] Code of Canon Law, c. 391.

referring for it) in any way, Bishop Paprocki must ensure that two Catholic hospital systems in his Diocese likewise do not facilitate assisted suicide, even via referrals.

24. Plaintiff Lutheran Care Center is a non-profit, faith-based skilled nursing home residence licensed for 96 beds, all of which are Medicare and Medicaid certified. It also contracts for hospice services with two area hospitals. The Lutheran Care Center is owned and supported by 20 area Lutheran churches and operates according to Christian principles. As such, it likewise cannot promote or in any way cooperate in assisted suicide. It is located in Altamont, Illinois, in the Southern District of Illinois.

25. Defendant Mario Treto, Jr., is Secretary of the Illinois Department of Financial and Professional Regulation and is sued in his official capacity.

26. Defendant Sameer Vohra is the Director of the Illinois Department of Public Health and is sued in his official capacity.

## FACTUAL BACKGROUND

27. EOLO creates a statutory right to what it euphemistically calls "medical aid in dying"—i.e., physician-assisted suicide—by the self-administration of lethal drugs if requested by a patient who is determined to have a "terminal disease" that "will, within reasonable medical judgment, result in death within 6 months." 410 ILCS 22/5, 10. As there is no restriction otherwise, a person may qualify for assisted suicide even if they would reasonably be expected to live longer than six months *with appropriate treatment*—allowing practitioners to artificially qualify patients who otherwise could be expected to live months or years after a "terminal" diagnosis.

28. The onus for kickstarting EOLO's statutory process is initially placed on attending physicians. EOLO mandates that attending physicians "provide sufficient information

9

to a patient regarding *all* appropriate end-of-life care options, . . . as well as the foreseeable risks *and benefits* of each, so that the patient can make a voluntary and affirmative decision regarding the patient's end-of-life care." 410 ILCS 22/15(b).

29. EOLO's definitions make clear that one of those "end-of-life options" is assisted suicide: "'Aid in dying' means an end-of-life care option that allows a qualified patient to obtain a prescription for medication pursuant to this Act." 410 ILCS 22/10.

30. EOLO then creates a "qualifying" process triggered by any patient's request "for aid in dying." 410 ILCS 22/35(a). After such a request, the attending physician "shall conduct an evaluation" to determine if the patient qualifies for assisted suicide. 410 ILCS 22/35(a). The attending physician must evaluate, among other criteria, the suicide candidate's mental capacity, purported freedom from undue influence or coercion, diagnosis, prognosis, the risks and "benefits" of a prescription for self-administered suicide drugs, and any "feasible alternatives" to suicide. *Id.* § 35(a)(1)-(4).

31. This evaluation is followed by referral to a consulting physician to confirm that the patient has requested suicide drugs, has the requisite mental capacity, and is suffering from the requisite terminal illness "with a prognosis of 6 months or less to live." 410 ILCS 22/35(a)(7), 22/40. Referral to a mental health specialist to confirm the patient's mental capacity is required only if "the attending physician or the consulting physician"—neither of whom need be a specialist in mental health—"has doubts" about the patient's mental capacity *and* is "unable to confirm" otherwise. *Id.* § 45(a).

32. After the patient is deemed "qualified," he or she "may orally request a prescription for" lethal substances pursuant to EOLO from his or her attending physician, who must document that request in the patient's record. 410 ILCS 22/25(a)(1)-(2). The "qualified

patient *shall* provide a written request in accordance with this Act to the patient's attending physician after making the initial oral request." *Id.* § 25(a)(3). The qualified patient must make a later confirmatory repetition of the oral request, no earlier than five days after making the initial oral request. *Id.* § 25 (a)(4), § 35.

33.     The attending physician then must, among other things, provide information on "the recommended procedure for self-administering the medication to be prescribed" and admonish the patient not to do so "in a public place." 410 ILCS 22/35(a)(13). Then, the attending physician "shall" "deliver" the lethal substances to the patient "personally, by mail, or through . . . a licensed pharmacist." *Id.* § 35(a)(14). There is no time limit on when the patient must ingest the drugs. Indeed, the patient must be specifically informed about "the *safekeeping* and proper disposal of unused medication in accordance with State and federal law." *Id.* § 35(a)(13)(C)(ii). Patients are thus free to ingest the prescribed substances even if their "terminal" diagnosis is manifestly inaccurate or their illness goes into remission or is otherwise successfully treated.[10]

34.     Critically, under EOLO, physician-assisted suicide is deemed "part of *general medical care* and complements other end-of-life options, such as comfort care, pain control, palliative care, and hospice care, for individuals to have an end-of-life experience aligned with their beliefs and values." *Id.* §5(a)(1).

---

[10] *Cf., e.g.*, Brian Mastre, "Colorado teacher who was given months to live celebrates 10 years in remission after Omaha cancer trial," First Alert 6 Omaha, Aug. 3, 2026, https://www.wowt.com/2026/08/04/colorado-teacher-who-was-given-months-live-celebrates-10-years-remission-after-omaha-cancer-trial/; *see also* Dr. David J. Hilger, M.D., "Every Day Miracles," The Pulse of Catholic Medicine, July 8, 2026, https://www.cathmed.org/the-pulse/every-day-miracles/ (noting experience of Dr. Edward Gatz, who "was given six months to live after surgery for a high-grade esophageal cancer" at the age of 51, but lived to the age of 89 without further treatment; Dr. Gatz and his wife daily sought the intercessory prayers of Jeanne Jugan, foundress of the Little Sisters of the Poor, for healing; the Vatican determined the cure was miraculous and canonized Jeanne Jugan as a result).

35.     EOLO therefore presents a crisis of conscience for physicians and faith-based facilities opposed in conscience to any form of suicide and who thus reject any form of cooperation with it—particularly under the guise of "health care."

### Mandated Cooperation in Physician-Assisted Suicide<br>By Physicians and Faith-Based Facilities

36.     While purporting to respect the right in conscience to refuse to participate in physician-assisted suicide, EOLO then adopts a complex statutory scheme that directly compels participation in various ways by both "health care professionals" (i.e., physicians, pharmacists, and mental health professionals) and a broad range of "health care entities," 410 ILCS 22/10,[11] even if they conscientiously object.

37.     After stating that no "health care professional" or "health care entity" "shall . . . be under any duty . . . to participate in the provision of aid-in-dying care," 410 ILCS 22/60(a); 22/65(a), EOLO incorporates by reference the Health Care Right of Conscience Act (HCRCA), 745 ILCS 70/1, *et seq. See id.* at 22/60(g), 22/65(g). In other words, health care professionals or entities that object to assisted suicide must nonetheless comply with the requirements of HCRCA. The interplay between EOLO and HCRCA results in numerous statutorily mandated violations of conscience as shown by the following facts.

38.     First, HCRCA mandates that health care facilities adopt protocols under which medical personnel "*shall* inform a patient of the . . . risks and *benefits* of" all their "treatment options in a timely manner, consistent with the *current standards of medical practice or care*"—

---

[11] "'Health care entity' means a hospital or hospital affiliate, nursing home, hospice or any other facility licensed under any of the following Acts: the Ambulatory Surgical Treatment Center Act; the Home Health, Home Services, and Home Nursing Agency Licensing Act; the Hospice Program Licensing Act; the Hospital Licensing Act; the Nursing Home Care Act; or the University of Illinois Hospital Act. [The term] does not include a physician." *Ibid.*

12

*even if the patient has not asked about a particular option*. 745 ILCS 70/6.1(1).

39.    Second, in addition to the HCRCA, and as previously noted, EOLO not only specifies that physician-assisted suicide is "part of general medical care and complements other end-of-life *options*" but also independently mandates that attending physicians inform patients of "*all* appropriate *end-of-life care options* . . . as well as the foreseeable risks *and benefits* of each." 410 ILCS 22/15(b); *see also id.* § 10 (defining "Aid in dying" as "an end-of-life care option that allows a qualified patient to obtain a prescription for medication pursuant to this Act"). That is, EOLO, echoing HCRCA, makes physician-assisted suicide part of the standard of "medical care," of which even conscientiously objecting health care professionals *must inform relevant patients and describe the alleged "benefits"*—even if those patients haven't asked about it.

40.    Third, HCRCA requires that when a health care facility, physician, or health care personnel is "unable to permit, perform, or participate in a health care service that is a diagnostic or treatment option requested by a patient because the health care service is contrary to the conscience" of such facility or person, then the patient "shall . . . be referred, transferred, or given information in accordance with paragraph (3)" of HCRCA. 745 ILCS 70/6.1(2).

41.    Fourth, paragraph (3) of HCRCA § 6.1 provides that, if requested by the patient or his/her representative, the health care facility, physician, or health care personnel "*shall*" *refer to, transfer to, or provide the patient written information about* "other health care *providers who they reasonably believe may offer* the" objected-to "health care service."[12] *Id.* § 6.1(3).

---

[12] Several provisions of the Health Care Right of Conscience Act are the subject of ongoing legal challenge by Illinois pregnancy centers. A district court permanently enjoined the "**benefits**"-discussion requirement but denied injunctive relief as to the referral requirement. *See Nat'l Inst. of Family and Life Advocs., et al. v. Treto*, 777 F. Supp. 3d 867 (N.D. Ill. April 4, 2025). The parties cross-appealed to the Seventh Circuit, which heard oral argument on April 10, 2026, and a decision is pending. (*See* Case Nos. 25-1603 & 25-1659 & 25-1655 & 25-1657.)

42. Fifth, in addition to the HCRCA, EOLO requires that when "a health care professional or health care entity is unable or unwilling to carry out an individual's request for aid in dying," that professional or entity, in accordance with the HCRCA, "*shall, at a minimum*: (1) inform the individual of [his/her] . . . inability or unwillingness; (2) *refer the individual either to a health care professional who is able and willing to evaluate and qualify the individual or to another* individual or entity *to assist the requesting individual in seeking aid in dying, in accordance with the Health Care Right of Conscience Act*." 410 ILCS 22/70(b)(1)-(2). Thus, the religious recusant from physician-assisted suicide, be it an individual or a facility, is statutorily compelled to declare its conscientious opposition to the patient and *then* make a referral, *contrary to conscience*, to an individual or entity the recusant has determined is not opposed to what the recusant opposes—suicide—*for the purpose of making the suicide happen*.

43. Thus, to comply with EOLO and the incorporated HCRCA, the medical professional or facility that is religiously opposed to physician-assisted suicide must nonetheless facilitate it by making a referral to, or providing information about, a "health care provider" reasonably believed to be willing to provide it, which effectively requires the recusant physician or facility to *investigate the availability* of suicide-ready "health care providers." This mandate extends to all aspects of the physician-assisted suicide process, including the process of "qualifying" the suicide candidate by both an attending and consulting physician.

44. Sixth, health care entities, including faith-based entities, are also prohibited from "intentionally denying a patient access to medication pursuant to this Act by intentionally failing to transfer a patient and the patient's medical records to another health care professional in a timely manner." 410 ILCS 22/65(f). This provision conflates two different types of transfers— one in which the objecting physician must identify and choose the recipient health care

practitioner for the purposes of facilitating assisted suicide, and one in which the *patient* or patient surrogate *independently* identifies and chooses the transferee practitioner. These two types of transfers have very different moral and religious implications for the Plaintiff health care entities and professionals. *See infra.*

45.     Seventh, the recusant health care professional or health care entity is required to enter into the patient's medical record the patient's request for physician-assisted suicide and the inability to honor that request. 410 ILCS 22/70(b)(1)-(3). Thus, the religious recusant from physician-assisted suicide, be it an individual practitioner or a faith-based facility, must make a written record that effectively triggers the qualifying process by another practitioner. *See id.* § 35(a).

46.     In sum, under the statutory scheme created by the interplay of EOLO and HCRCA, medical professionals and faith-based health care facilities are compelled in multiple overlapping ways to engage in speech and acts that violate their rights under both the free exercise and free speech clauses of the First Amendment:

    a.  Faith-based facilities *must* enact protocols that require informing patients of the so-called "benefits" of physician-assisted suicide as now provided under EOLO, whether or not the patient requests that information.

    b.  Physicians and facilities alike *must* then inform their patients of the alleged "benefits" of physician-assisted suicide as a newly available "treatment option" that they now have a legal right to pursue.

    c.  Recusant health care professionals or facilities *must* refer the patient to another health care professional "able and willing" to "qualify" the patient for suicide, or else refer the patient to another individual or entity who will assist the patient in

arranging a physician-assisted suicide in the manner provided by EOLO.

d. Physicians and facilities that forbid any form of cooperation in physician-assisted suicide *must* nonetheless direct a transfer for the requesting patient to other facilities where physician-assisted suicide is available, or else provide written information about facilities where the patient can arrange to commit suicide in the manner provided by EOLO.

e. Physicians and facilities opposed to physician assisted suicide *must* personally record the date of the patient's request for assisted suicide and their inability to participate in or facilitate a patient's suicide into the patient's medical records—creating an official medical-record entry that processes, advances, and otherwise participates in a patient's request for assisted suicide and effectively triggers the qualifying process with another practitioner.

f. Recusant facilities must *promptly and directly* transfer patients seeking physician-assisted suicide to a suicide-ready facility or face liability under EOLO.

**Mandatory Hiring and Retention of Personnel
Engaging in Physician-Assisted Suicide**

47.     Although health care entities may prohibit their individual practitioners from "practicing aid-in-dying care while performing duties for the entity"—if such practitioners are given up-front and annual advance written notice to that effect—health care entities may *not* forbid their practitioners from *personally* providing information, **even on the facility's premises**, concerning "recommended treatment and treatment alternatives, and the risks **and benefits** of each"—including assisted suicide—or "information regarding . . . how to access **those resources** for obtaining care of the patient's choice." 410 ILCS 22/65(e)(1)-(2). Thus, health care facilities **must allow their practitioners to promote assisted suicide on the**

16

**premises**—urging patients to go off premises to obtain a gravely immoral medical intervention—even if doing so contradicts the facility's express opposition to any cooperation or participation with assisted suicide.

48. Individual practitioners employed by or contracting with entities opposing physician-assisted suicide are further authorized to provide outright "**aid-in-dying care** outside the scope of the health care professional's employment or contract with," and "off the premises of," "the prohibiting entity," so long as the "health care professional . . . explicitly tell[s] the patient that" the health professional is acting independently of his or her associated health care entity. *Id.* § 65(e)(3).

49. Objecting facilities also may not restrict physicians who attend their patients from "being present . . . outside the scope of the health care professional's employment or contractual duties, when a qualified patient" commits suicide by the self-administration of physician-prescribed suicide drugs "if requested by the qualified patient or their representative." 410 ILCS 22/65(e)(4).

50. Accordingly, suicide-friendly practitioners at facilities opposed to physician-assisted suicide **must be retained by the facility**, even if the practitioner flagrantly violates the facility's religiously-motivated ban on any cooperation or participation in suicide. Such insubordinate employees may not be subject to "censure, discipline, suspension, . . . loss of privileges, . . . or other penalty" for actively promoting assisted suicide in the scope of their employment or contract on an objecting health care facility's premises. 410 ILCS 22/70(c); *see id.* § 65(e)(1)-(2). Nor may they be subject to the same "for providing aid-in-dying care in accordance with the standard of care and in good faith under this Act when: (1) engaged in the outside practice of medicine and off of the objecting health care entity's premises; or (2)

providing scientific and accurate information about aid-in-dying care to a patient when discussing end-of-life care options." *Id.* § 70 (d)(1)-(2).

51.     Thus, EOLO forces even religious health care entities that object to assisted suicide to nonetheless hire and retain—i.e., associate with—individual practitioners who *expressly promote* assisted suicide on the same facility's premises and even *directly provide and/or facilitate* assisted suicide off premises (putatively on their own time), even if they do so publicly or otherwise promote their participation in assisted suicide.[13]

### Additional Statutory Restrictions on Health Care Entities and Physicians Opposed to Physician-Assisted Suicide

52.     EOLO not only mandates these affirmative violations of conscience but also piles on thinly veiled prohibitions that chill or punish any form of speech motivated by a physician's conscience-driven opposition to physician-assisted suicide. It also coerces practical acceptance of assisted suicide through mandating objectors' silence about, and therefore tacit approval of, what the recusant physician regards as a sin.

53.     Notably, EOLO provides that "[a]ctions taken in accordance with this Act do not, *for any purposes*, constitute suicide, assisted suicide, euthanasia, mercy killing, homicide, murder, manslaughter, elder abuse or neglect, or any other civil or criminal violation under the law." 410 ILCS 22/100(b).

54.     With this premise established, EOLO ominously forbids health care entities from "intentionally misleading a patient or *deploying misinformation to obstruct access to services pursuant to this Act*," which "constitutes coercion or undue influence." 410 ILCS 22/65(f). As

---

[13] By way of comparison, in the first five years after Oregon implemented legal physician-assisted suicide in 1997, "many" of the resulting "prescriptions appear to have been written . . . by a very small handful of politically active physicians." Neil Gorsuch, "The Future of Assisted Suicide and Euthanasia," Princeton University Press (2006), at pg. 119.

noted, EOLO nowhere defines "deploying misinformation," and it prohibits only "misinformation" that "*obstructs*"—not "misinformation" that *facilitates*—access to assisted suicide.

55. EOLO further provides that a physician "shall not engage in false, misleading, or deceptive practices relating to a willingness to qualify a patient or provide aid-in-dying care" and that "[i]ntentionally misleading a patient constitutes coercion or undue influence." *Id.* § 60(f).

56. "Coercion or undue influence" is specifically defined to include "prevent[ing] a qualified patient, *in a manner that conflicts with the Health Care Right of Conscience Act*, from obtaining or self-administering medication pursuant to this Act." 410 ILCS 22/10. And EOLO makes clear that "civil or criminal liability" can "*aris[e] from*" "[i]ntentionally or knowingly *coercing or exerting undue influence on* a patient with a terminal disease . . . to request or use *or not use* medication pursuant to this Act." *Id.* § 95(a) & (a)(2).

57. Thus, especially given the law's mandate that seeking "aid in dying" does not constitute suicide or euthanasia, set forth in 410 ILCS 22/100(b), any statement against physician-assisted suicide—*even the simple statement that it constitutes suicide*—could expose a physician to discipline or liability on the grounds that the statement constituted "misinformation to obstruct" under EOLO, or was used to "mislead" or "deceive" a patient or otherwise "coerce or unduly influence" him or her to *not* choose assisted suicide.

58. Additionally, any physician who "prevents" or "misleads" a patient from accessing assisted suicide by failing to discuss its alleged "benefits," by refusing to refer or transfer to a "health care provider" whom the physician "reasonably believes" is willing to cooperate in the suicide, and certainly by any successful attempt to dissuade the patient from committing suicide, will be liable for "coercion or undue influence" in violation of EOLO.

19

59.     Thus, to avoid liability for coercion or undue influence, *including by a simple statement that physician-assisted suicide is "suicide,"* a physician religiously opposed to physician-assisted suicide must remain silent as the patient opts to commit suicide under the provisions of EOLO and the HCRCA.

60.     Additionally, EOLO forbids health care professionals from engaging in what it deems "false, misleading, or deceptive practices relating to a willingness to qualify a patient or provide aid-in-dying care," 410 ILCS 22/60(f), and health care entities from engaging in "false, misleading, or deceptive practices relating to [their] policy around end-of-life care services," *id.* § 65(f). There is no *mens rea* requirement, nor any definition of "false, misleading, or deceptive practices relating to [such] a willingness." (For example, Plaintiffs are committed to providing many forms of end-of-life care to patients who are dying, but they are not willing to provide or cooperate in so-called "medical aid in dying," i.e., assisted suicide.) EOLO's ban on even unintentional "false, misleading, or deceptive practices" in this regard effectively places Plaintiffs in the crosshairs of potential civil and criminal liability.

61.     That EOLO requires religiously motivated medical professionals to suppress their religious convictions under pain of sanctions for "coercion or undue influence" is confirmed and crowned by the statute's Orwellian requirement that a qualified patient's death by self-administration of physician-prescribed suicide drugs "shall not be designated a suicide or homicide," that the patient's act of self-administering the medication "*shall not be indicated on the death certificate*," and that instead "the death shall be attributed to the underlying terminal disease." 410 ILCS 22/90(b)-(c).

62.     Thus, even non-participating healthcare professionals, including these Plaintiffs, are compelled, under pain of professional sanctions, to falsify the stated cause of death, even if

20

doing so violates their religious belief against intentional falsehood or their religious belief that one cooperates in another's sin by concealing it.

63.     As noted, EOLO leaves no doubt of the statutory intent to punish religiously motivated speech against physician-assisted suicide by removing any protection from civil or even criminal liability under HCRCA, not only for "coercing or exerting undue influence on a patient with a terminal disease" to *request or use* medication "pursuant to this Act," but also to *"not use* medication pursuant to this Act." 410 ILCS 22/95(a)(2).

64.     In sum, in addition to numerous infringements on free exercise, freedom of speech, freedom of expressive association, and due process averred above as to physicians and facilities, attending physicians are (a) compelled to refrain from protected speech in opposition to physician-assisted suicide (or merely distinguishing "assisted suicide" from other end-of-life-care) for fear that such speech will be deemed "false" or "misleading" as well as "coercion and undue influence" in violation of both EOLO and HCRCA; and (b) compelled to refer or transfer patients seeking physician-assisted suicide to a suicide-ready practitioner, for fear that failure to do so will be deemed "coercion" or "undue influence" that "prevented" a patient from "obtaining or self-administering" suicide drugs.

### Total Loss of Statutory Conscience Protection for Physicians and Facilities Opposed to Physician-Assisted Suicide

65.     EOLO provides that, "[e]xcept as set forth in Section 65," "a health care professional or health care entity shall not be subject to civil or criminal liability, licensing sanctions, or other professional disciplinary action for actions taken in good faith compliance with this Act." *Id.* § 70(a).

66.     By necessary implication, any *failure* to comply with EOLO—including its "benefits"-discussion and referral mandates, and its prohibition of anti-suicide speech deemed

"misleading" or "undue influence or coercion"—removes protection from any corresponding criminal, civil, licensure, or other professional liability. And Section 95 expressly provides that "coercion" and "undue influence"—including refusal to refer and discuss assisted suicide's alleged "benefits" in accord with HCRCA—can give "ris[e]" to civil and criminal liability.

67.     Thus, any form of conscientious opposition to the practice of physician-assisted suicide in the course of a recusant physician's or facility's treatment of a patient seeking that "option" will, paradoxically, strip the physician or facility of all conscience protection under HCRCA or any health care licensure statute or regulation.

68.     Moreover, every HCRCA "health care facility" is bound to adopt written, legally compliant "access to care and information protocols," on which all HCRCA conscience protection is conditioned, 745 ILCS 70/6.1. As noted herein, Plaintiff Lutheran Care Center thus faces an immediate choice between enacting (1) a policy consistent with its faith, which prohibits what EOLO requires, or (2) a policy compliant with EOLO, which requires what its faith forbids.

### Consequences for Violating EOLO's Mandates

69.     The consequences for violating EOLO are severe. Defendant Treto recently asserted that HCRCA's "referral" and "benefits"-discussion mandates represent "*a fundamental requirement of medical practice*" that "providers give tailored and medically appropriate information to patients," and also that "patients reasonably expect information of this sort from their medical providers" and "rely on it every day to make critical medical decisions."[14] In other words, discussing the alleged "benefits" (as the State sees them) of and referring for health care services that violate one's conscience—which now includes assisted suicide under EOLO—are

---

[14] Defendant-Appellee and Cross-Appellant Treto's Combined Principal and Response Brief, at pg. 17 (Oct. 27, 2025), in *Schroeder & NIFLA v. Treto*, Nos. 25-1603, 25-1659, 25-1655, and 25-1657 (7th Cir.). *See supra*, n.12.

allegedly basic elements of medical competency. That premise has potentially devastating consequences for Plaintiffs under existing statutes.

70. For instance, the Medical Practice Act of 1987 regulates the licensure status of individual physicians. 225 ILCS 60/1, *et seq.* The Act provides that the Department of Financial and Professional Regulation "may revoke, suspend, place on probation, refuse to issue or renew, or take any other disciplinary or non-disciplinary action as the Department may deem proper with regard to the licensure or permit of any person issued under this Act" for no fewer than 50 different violations. *Id.* § 22. The Department may impose fines of up to **$10,000 for each violation.** *Id.*

71. Several of these grounds readily (or at least potentially) encompass EOLO violations—particularly given Defendant Treto's aforementioned admission that failure to discuss a "treatment option's" alleged "benefits" and refer for it violates "a fundamental requirement of medical practice"—such as:

(4) Gross negligence in practice under this Act;

(5) Engaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public;

(10) Making a false or misleading statement regarding their skill or the efficacy or value of the medicine, treatment, or remedy prescribed by them at their direction in the treatment of any disease or other condition of the body or mind;

(16) Abandonment of a patient;

(20) Immoral conduct in the commission of any act . . .;

(21) Willfully making or filing false records or reports in his or her practice as a physician;[15]

---

[15] Ironically, under EOLO, a "false" report now includes *not* falsifying a person's death certificate by accurately reporting that lethal substances pursuant to EOLO were a cause of death.

(22) Willful omission to file or record . . . medical reports as required by law . . .;

(26) A pattern or practice or other behavior which demonstrates incapacity or incompetence to practice under this Act;

(31) the use of any false, fraudulent, or deceptive statement in any document connected with practice under this Act;

(41) Failure to establish and maintain records of patient care and treatment as required by this law;

(43) Repeated failure to adequately collaborate with or provide medical direction to a licensed advanced practice nurse.

225 ILCS 60/22(A).

72. Failure to comply with EOLO's mandates can trigger any number of these provisions, jeopardizing the Plaintiff physicians' licensure status in Illinois and threatening them with up to $10,000 in fines for *each* violation.

73. Illinois regulations further specify what constitutes "dishonorable, unethical, or unprofessional conduct," providing that "[q]uestionable activities include, but are not limited to . . . (E) Committing . . . any . . . act or omission that breaches the physician's responsibility to a patient according to accepted medical standards of practice," and "(P) Failing to generate medical records for any patient encounter and/or care as specified by medical standards." Ill. Admin. Code tit. 68, § 1285.240(a)(2)(E), (P).

74. Plaintiff health care entities face similar existential threats. Under the Nursing Home Care Act, 210 ILCS 45 *et seq.*, for example, enforced by the Illinois Department of Public Health, 210 ILCS 45/1-109, a nursing home commits a "Type A violation" where its operation "(i) creates a substantial probability that the risk of . . . serious mental or physical harm to a resident will result therefrom or (ii) has resulted in actual physical or mental harm to a resident." 210 ILCS 45/1-129. "Type A" violations trigger the issuance of a "conditional license for a

period of 6 months to coincide with an acceptable plan of correction and . . . a fine of up to $12,500 per violation," or $10,000 per violation for mid-sized facilities licensed to care for 17 to 99 residents. 210 ILCS 45/3-305(1.5). A "repeated" Type A violation results in total revocation of the nursing home's license and "a fine of 3 times the fine computed under subsection (1)." *Id.* § 3-305(3). "Type B" violations occur where a nursing home's operation creates "a condition or occurrence . . . that is more likely than not to cause more than minimal physical or mental harm to a resident," 210 ILCS 45/1-130, triggering a fine of up to $1,100 per violation or $750 for mid-size facilities, 210 ILCS 45/3-305(2). Failing to "comply with an accepted plan of correction for a Type 'B' violation" or a resulting "administrative warning" triggers the "automatic[] issu[ance]" of "a conditional license for a minimum of 6 months," along with a subsequent acceptable "plan of correction" and additional potential fines. *Id.* § 3-305(4). And a nursing home commits a "Type C" violation where its operation "creates a substantial probability that less than minimal physical or mental harm to a resident will result therefrom." 210 ILCS 45/1-132. Committing eight or more Type C violations in a single survey results in a fine of up to $250 per violation, or $200 per violation for mid-sized nursing homes. 210 ILCS 45/3-305(2.5).

75.     Moreover, "abuse" of a resident is broadly defined to mean "any physical or mental injury" to a resident that is other than accidental. 210 ILCS 45/1-103.

76.     Thus, nursing homes face significant sanctions for any operational refusal to discuss the "benefits" of and "refer" for assisted suicide (along with other EOLO violations) that results in alleged psychological or physical harm to their residents, or even the risk of it. Considering that a prime justification of EOLO's proponents is cessation of suffering, in such circumstances, any action delaying assisted suicide has the potential to extend suffering that would have necessarily ceased upon death.

25

77.     Illinois regulations also provide that nurses regulated by the Nurse Practice Act commit unethical or unprofessional conduct where, among other things, they "violat[e] . . . the ethical standards of the profession (such as . . . not respecting the rights of patients . . . )." Ill. Admin. Code tit. 68, § 1300.90(a)(7).

78.     The Department of Public Health also disciplines hospitals under the Hospital Licensing Act, 210 ILCS 85/1, *et seq.* For example, "abuse" is broadly defined to mean "*any* physical or mental injury . . . intentionally inflicted by a hospital or hospital affiliate, employee, agent, or medical staff member on a patient," excluding any "services done in good faith in the interest of the patient according to established medical and clinical standards of care." 210 ILCS 85/9.6(t)("Abuse"). Although the Act also provides that "[n]othing in this Section shall be construed to mean that a patient is a victim of abuse because of health care services provided or not provided by health care professionals," *id.* § 9.6(q), refusal to make the patient aware of the alleged "benefits" of newly legalized assisted suicide and *refer* for it is not thereby immunized—especially given Defendant Treto's aforementioned admission that such "benefits" discussions and referrals are a "fundamental requirement" of medical practice. And "[a]ny . . . person may make a report of patient abuse to the Department," *id.* § 9.6(f), which is presumed to be in good faith, *id.* § 9.6(i), and which triggers an investigation by the Department of Public Health, *id.* § 9.6(l), and a mandatory internal review by the hospital itself if the report is made by hospital employees, staff, or administrators, *id.* § 9.6(b)-(f).

79.     Moreover, the Department may deny, suspend, or revoke a hospital's license to operate for any "substantial failure to comply" with the Hospital Licensing Act. 210 ILCS 85/7(a). The Department is also responsible for issuing annual approvals of existing hospital licenses. 210 ILCS 85/6(b). As such, it may "make investigations to determine if the . . . licensee is complying

with the minimum standards prescribed by the Department." *Id.* And, as noted, EOLO confirms that providing or at least discussing the alleged "benefits" of and "referring" for assisted suicide is now part of the minimum standard of care in Illinois—no matter how much a hospital objects.

80. Therefore, given EOLO's sweeping definition of "coercion and undue influence," which expressly creates a hair-trigger standard for liability for failure to follow the HCRCA, the potential for violation proceedings against Plaintiff health care entities and health care professionals deemed in any way to impede access to assisted suicide is manifest.

### Existing Federal and Illinois Law on Assisted Suicide

81. In addition to flouting millennia of medical, legal, and philosophical tradition,[16] EOLO's mandates conflict with directly applicable federal law and open a gaping exception to Illinois's longstanding prohibition on inducing another to commit suicide.

82. Specifically, the federal Assisted Suicide Funding Restriction Act of 1997 prohibits using federal health care funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of *assisting in causing*, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 14402(a)(1). Thus, health care entities receiving federal funds (including through Medicare or Medicaid) are effectively forbidden from discussing the "benefits" of and "referring" their patients for assisted suicide as a

---

[16] *See supra*, ¶ 1; *see also* Gorsuch, The Future of Assisted Suicide, at pgs. 22-30 (observing suicide was generally condemned by Athenian law, Plato's *Republic*, Aristotle, Pythagoras, Epicurus, St. Augustine, St. Thomas Aquinas, the Council of Braga (AD 562), the Council of Toledo (AD 693), the Council of Hertford (AD 672), Lord Bracton (13th century, including in cases involving "weariness of life or . . . unwilling[ness] to endure further bodily pain"), pre-revolutionary colonial America (including 17th-century laws on ignominious burials), and—despite the repeal of laws punishing the families of suicide decedents—a post-revolutionary America consensus punishing those who *assist* another's suicide, consistent with a broader mid-19th century development extending accessory liability to accessory *before* the fact of any given crime).

matter of current federal law.

83. Additionally, the Affordable Care Act provides that "any State" receiving "Federal financial assistance under this Act . . . or any health plan created under this Act," thus including Medicare and Medicaid funding,[17] "may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a). Accordingly, EOLO's demands that Plaintiffs promote assisted suicide's so-called "benefits" and specifically refer or transfer patients to obtain it, in order to avoid committing "coercion" or "undue influence" subject to civil and criminal liability, expressly discriminates based on their refusal to furnish such purported health care services and thus violates squarely applicable federal law.

84. EOLO also shirks, by creating an exemption to, current Illinois law forbidding "[i]nducement to commit suicide." 720 ILCS 5/12-34.5. A person engages in such inducement where, among other things, he or she "[w]ith knowledge that another person intends to commit suicide, intentionally (i) offers and provides the physical means by which another person commits or attempts to commit suicide, or (ii) participates in a physical act by which another commits or attempts to commit suicide." *Id.* § 12-34.5(a)(2). Read plainly, subsection (ii) readily encompasses the "physical act" of speech in promoting and referring for assisted suicide, or directly arranging a transfer for it. In any event, this statute confirms the radical change

---

[17] Mandy French, "What effect does the Affordable Care Act have on Medicare," MedicalNewsToday, Feb. 27, 2025, https://www.medicalnewstoday.com/articles/affordable-care-act-and-medicare; KFF, "Status of State Medicaid Expansion Decisions," May 21, 2026, https://www.kff.org/medicaid/status-of-state-medicaid-expansion-decisions/.

introduced by EOLO, which expressly *authorizes* the provision of "physical means by which another commits or attempts to commit suicide"—but only for "terminally ill" patients.

85. EOLO's legalization of assisting suicides only for "terminally ill" patients clashes with yet another federal law—the Americans with Disabilities Act (ADA). The ADA makes clear that no person with a disability shall "be denied the benefits of" a state's "services, programs, or activities" or "be subjected to discrimination." 42 U.S.C. §§ 12131, 12132. And "terminal illness" generally qualifies as a disability. 42 U.S.C. § 12102(1)(A), (2)(A), (2)(B). But, under EOLO, "terminally ill" patients are expressly denied the protection of Illinois's statute prohibiting inducement to commit suicide. They are also expressly denied the protections of Illinois's Suicide Prevention Education and Treatment Act, 410 ILCS 53/15, and the resulting Illinois Suicide Prevention Strategic Plan, which is aimed at reducing the conditions that lead to, and otherwise *preventing*, individual suicide.[18]

**Catholic Teaching Prohibiting Cooperation in Assisted Suicide**

86. The Catholic Church, to which the individual Plaintiff physicians adhere, has longstanding and clear teachings against any cooperation with assisted suicide—consistent with the Hippocratic Oath and centuries of common law. That reality is particularly ironic given that Governor Pritzker signed EOLO into law on December 12, 2025, the traditional Catholic "Feast

---

[18] Illinois Department of Public Health, *Illinois Suicide Prevention Strategic Plan: Directions, Goals, and Objectives* (2020), https://dph.illinois.gov/content/dam/soi/en/web/idph/files/publications/illinoisstrategicplan2020reduced.pdf; *see, e.g., id.* at pg. 39 of 101 (noting "[a]n effective suicide prevention strategy is to ensure that laws and policies give health care systems incentives to provide access to care for mental and substance use disorders"); *cf.* 410 ILCS 22/35(a)(9) (requiring referral to a mental health professional only if the non-mental-health physician "observes signs that the individual may not be *capable of making an informed decision*"—regardless of whether the patient manifests mental health symptoms that do vitiate his or her "*mental capacity*"); *see also* 410 ILCS 22/10 (defining "Informed decision" and "Mental capacity").

Day" of Our Lady of Guadalupe, whom Pope John Paul II declared a symbol of the "Gospel of life . . . life with dignity for all."[19]

87. The Catechism of the Catholic Church (CCC) states that "an act . . . of itself or by intention" that "causes death in order to eliminate suffering constitutes a murder gravely contrary to the dignity of the human person and to the respect due to the living God, his creator." CCC #2277. And, "though a certain psychological, cultural and social conditioning may induce a person" to commit suicide and thus "lessen[ ] or remov[e] subjective responsibility,"[20] "[s]uicide . . . is gravely contrary to the just love of self" and "offends love of neighbor" and "is contrary to love for the living God." CCC #2281. Moreover, "**[v]oluntary co-operation** in suicide is contrary to the moral law." CCC #2282.

88. Additionally, in his encyclical letter *Evangelium Vitae* (1995),[21] Pope John Paul II declared that "[t]o concur with the intention of another person to commit suicide and to help in carrying it out through so-called 'assisted suicide' means to cooperate in, and at times to be the actual perpetrator of, an injustice which can never be excused, even if it is requested." ¶ 66. Rather, "[t]rue 'compassion' leads to sharing another's pain; it does not kill the person whose suffering we cannot bear"; "[m]oreover, the act of euthanasia appears all the more perverse if it is carried out by those . . . such as doctors, who by virtue of their specific profession are supposed to care for the sick person even in the most painful terminal stages." *Ibid.*

89. Additionally, the Vatican's Congregation for the Doctrine of the Faith has issued at least three formal teachings on the dignity of human life in its final stages and thus the

---

[19] Homily of John Paul II, Basilica of Our Lady of Guadalupe, Mexico City (Jan. 23, 1999), at ¶ 8.
[20] Pope John Paul II, *Evangelium Vitae* (1995), at ¶ 66, https://www.vatican.va/content/john-paul-ii/en/encyclicals/documents/hf_jp-ii_enc_25031995_evangelium-vitae.html.
[21] *Ibid*.

inherent wrongness of euthanasia and assisted suicide—including any cooperation with it. Specifically, its "Declaration on Euthanasia" states the only "right to die" is "the right to die peacefully with human and Christian dignity"— "*not* . . . the right to procure death either by one's own hand or by means of someone else." Sacred Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980), § IV.[22] Further, "[t]he pleas of gravely ill people who sometimes ask for death are not to be understood as implying a true desire for euthanasia; in fact, it is almost always a case of an anguished plea for help and love." *Id.* at § II.

90. More recently, under Pope Francis, the Congregation issued *Samaritanus Bonus*: On the care of persons in the critical and terminal phases of life (2020),[23] which includes the following clear statements against assisted suicide and any cooperation with it:

- It is "definitive teaching that euthanasia is a *crime against human life* because, in this act, one chooses directly to cause the death of another innocent human being" (original emphasis), at § V, ¶ 1;

- "Euthanasia, therefore, is an intrinsically evil act, in every situation or circumstance," *ibid.*;

- "*Any formal or immediate material cooperation* in such an act is a grave sin against human life" (original emphasis), *ibid.*;

- "Any action that does not correspond to the purpose and values which inspire Catholic healthcare institutions is not morally acceptable and endangers the identification of the institution itself as 'Catholic,'" *id.* § V., ¶ 9;

- "**Institutional collaboration with other hospital systems is not morally permissible when it involves referrals for persons who request euthanasia**. Such choices cannot be morally accepted or supported . . . even if they are legally admissible," *ibid.*; and

---

[22] https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_19800505_euthanasia_en.html.

[23] https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20200714_samaritanus-bonus_en.html.

- "[T]here is a grave and clear obligation to oppose" "laws that permit euthanasia" "**by conscientious objection**"; "[f]rom the very beginnings of the Church, the apostolic preaching reminded Christians of their duty to obey legitimately constituted public authorities . . . but at the same time firmly warned that '**we must obey God rather than men**' (*Acts* 5:29)," *ibid.*

91. And in 2024, the (renamed) Dicastery for the Doctrine of the Faith, the same body that issued *Dignitas Infinita*[24], reaffirmed that "[e]uthanasia and assisted suicide" present "a special case of human dignity violation that is quieter but is swiftly gaining ground"; indeed, "appropriate palliative care" is "entirely different from—and is indeed contrary to—a decision to end one's own life or that of another person who is burdened by suffering"; "[t]here are no circumstances under which human life . . . could, as a result, be put to an end." *Dignitas*, ¶¶ 51-52. "**Therefore, helping a suicidal person to take his or her own life is an objective offense against the dignity of the person asking for it, even if one would be thereby fulfilling the person's wish**." *Id.* ¶ 52.

92. Accordingly, the current Holy Father, Pope Leo XIV, consistent with the position of the Illinois Catholic bishops, specifically expressed public disapproval over EOLO's signing by the Governor of Illinois.[25]

**Catholic Ethical and Religious Directives for Catholic Health Care Services**

93. In the health care context specifically, the U.S. Conference of Catholic Bishops

---

[24]https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_ddf_doc_20240402_dignitas-infinita_en.html.

[25] Joshua McElwee, "Pope Leo 'disappointed' in Illinois governor over assisted dying law," Reuters, Dec. 23, 2025, https://www.reuters.com/world/pope-leo-disappointed-illinois-governor-over-assisted-dying-law-2025-12-23/; Catholic Conference of Illinois, *Stop Assisted Suicide*, "First Do No Harm," Message from the Catholic Bishops, https://www.ilcatholic.org/stop-assisted-suicide/ (last visited Aug. 3, 2026) (confirming "The Catholic Bishops of Illinois oppose any legislation that would legalize assisted suicide").

(USCCB) has promulgated the "Catholic Ethical and Religious Directives" (ERDs)[26] expressly requiring Catholic health care facilities and professionals to refrain from providing or in any way cooperating with assisted suicide.

94. The ERDs require Catholic health care services to "adopt these Directives as policy" and mandate "adherence to them within the institution as a condition for medical privileges and employment." *See id.*, ERD No. 5.

95. The ERDs expressly prohibit "condon[ing] or participat[ing] in euthanasia or assisted suicide *in any way*." ERD No. 59. "Dying patients who request euthanasia [or assisted suicide] should instead be given loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death." *Ibid.* Additionally, "Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as . . . assisted suicide." ERD No. 70.

96. The ERDs also unquestionably prohibit referrals for assisted suicide, stating: "If a patient or a patient's surrogate requests a medical intervention that is not in accord with Catholic teaching, health care professionals *may not refer* the patient to another professional for the purpose of obtaining that intervention." ERD No. 27. Read in combination with ERD No. 59, therefore, a Catholic health care professional cannot refer a patient to another provider or person for the purposes of facilitating assisted suicide.

97. However, "[i]f a patient or patient's surrogate requests a transfer of care to another health care professional or facility that he or she *has independently chosen*, health care

---

[26] U.S. Conf. of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (7th ed. 2025), https://www.usccb.org/resources/ERDs-7th-ed-Approved_2025-11-12.pdf.

professionals should facilitate a safe transfer of care in compliance with legal and professional requirements while avoiding immoral cooperation." ERD No. 27. Thus, a Catholic health care professional can "facilitate" a transfer if it is *independently controlled by the patient or patient surrogate*, so long as the Catholic practitioner avoids immoral cooperation and abides the ERDs in doing so (e.g., by not condoning or expressing support for the patient's decision to undergo assisted suicide during the transfer process).

98.     The ERDs also provide that "[e]mployees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives." ERD No. 9. Thus, as a matter of policy, Catholic health care entities cannot allow their personnel to promote or refer for assisted suicide.

99.     The ERDs also require "honesty" in the relationship between patient and health care professional, and that:

> When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

ERD Part Three, "The Professional-Patient Relationship."

100.     Accordingly, Catholic health care entities are bound by direct authority of the U.S. Catholic Bishops to not discuss the benefits of or refer for assisted suicide, and to require the same of their employees, staff, physicians, and other health care professionals, consistent with Catholic teaching on the dignity of every human life even in its ending stages.

101.     Moreover, the ERDs provide that "the ultimate responsibility for interpreting and applying of the Directives rests with the diocesan bishop." ERDs at pg. 32. And "[e]ach diocesan

34

bishop has the ultimate responsibility to assess whether collaborative arrangements involving Catholic health care providers operating in his local church involve wrongful cooperation, give scandal, or undermine Catholic witness." *Ibid.* Indeed, because "Catholic health care expresses the healing ministry of Christ in a specific way within the local church," "the diocesan bishop exercises responsibilities" over Catholic health care in his diocese "rooted in his office as pastor, teacher, and priest." *Id.* at pg. 7.

### Lutheran Teaching on Assisted Suicide

102. Major Lutheran Church bodies similarly oppose assisted suicide in all its forms, based on the clear teachings of Scripture on the dignity of human life.

103. Luther's Small Catechism provides that the Fifth Commandment "forbids killing oneself (suicide), seeking help in killing oneself, **assisting a person in taking his or her own life (assisted suicide), or killing a person who asks to die or whose life is deemed too burdensome (euthanasia)**." That understanding is rooted in Scripture's teaching on God's creation and plan for every human person, including Jeremiah 1:5 ("Before I formed you in the womb I knew you, and before you were born I consecrated you; I appointed you a prophet to the nations"); Psalm 139:16 ("Your eyes saw my unformed substance; in Your book were written, every one of them, the days that were formed for me, when as yet there was none of them"); and Psalm 31:14-15 ("But I trust in You, O Lord; I say, 'You are my God.' My times are in Your hand."). *Ibid.*

104. Lutherans for Life, a national organization that aims to "equip[ ] Lutherans and their neighbors to be Gospel-motivated voices for Life,"[27] has issued a formal position statement

---

[27] https://lutheransforlife.org/about/.

against assisted suicide and euthanasia.[28] Its statement is grounded in, among other things, the following principles:

- "God alone, as King of Kings, has the right to determine when, in His perfect will each person shall die" (citing, *e.g.*, Job 1:21, Psalm 31:15, Psalm 139:16, and Ecclesiastes 3:2a);

- The Fifth Commandment prohibits even "aiding and abetting" the killing of innocent life; assisted suicide "in all of its forms" violates the Fifth Commandment;

- Legal assisted suicide tends to impair true palliative and mental health care in lieu of economic incentives to hasten death, and it corrupts the traditional physician role under the Hippocratic Oath;

- God is especially close to those who are suffering and facing death, which are a time of "pruning" from "perceived self-sufficiency," and Christ Himself sympathizes with and experienced the same suffering on their behalf.

- Those nearing the end of life "remain indispensable members of their communities";

- Although "treatment of pain may on occasion hasten death, the intent must never be to deliberately kill the patient";

- Christian health care professionals are encouraged "to resist the demands of authorities . . . to participate in MAiD (Acts 5:29)," i.e., assisted suicide, and "to advocate for the sanctity of all human life in the public square."

Position Statements of Lutherans for Life, "Medical Assistance in Dying," at pgs. 32-35.[29]

105. These principles motivate and guide the Lutheran Care Center's approach to end-of-life care and EOLO's legalization of assisted suicide, as discussed *infra*.

---

[28] Lutherans for Life, "Position Statements of Lutherans for Life," Updated July 27, 2026, at pg. 32, https://lutheransforlife.org/wp-content/uploads/2020/06/Position_Statements_Lutherans_For_Life_7-27-26.pdf.
[29] *Ibid.*

**Plaintiffs Provide Health Care in Accord with Catholic and Lutheran Teaching and Thus Cannot Cooperate in Assisted Suicide**

### *Dr. Michal Porubcin*

106.     Dr. Porubcin is a faithful Catholic hematologist oncologist practicing in East Moline, Illinois. He received his medical degree from Comenius University in 1986 and completed his residency at the National Institute of Health in 1989—both in his native Czechoslovakia.

107.     After the fall of the Berlin Wall, he traveled to the United States and participated in research at the world-renowned Memorial Sloan Kettering Cancer Center in New York City, from 1991 to 1993. He completed an additional residency program, followed by a fellowship in hematology oncology, at the University of South Alabama, which included a clinical rotation at the prestigious MD Anderson Cancer Center. In 1999, he and his family moved to Illinois, where he has been treating cancer patients ever since.

108.     Dr. Porubcin comes from a strong faith background. His late older brother was a diocesan Catholic priest. Another brother studied theology underground in Communist Czechoslovakia, and he is now a Salesian priest ministering to youth in Russia. Additionally, one of his aunts was a Catholic nun. Dr. Porubcin's worldview, personal philosophy, and faith formation during his 40-year medical career were most impacted by Word On Fire, a global Catholic media organization founded by Bishop Robert Barron. Today he is a strong advocate for those most vulnerable in society, unborn children and those facing end-of-life decisions.

109.     Dr. Porubcin has been an active member of the Catholic Medical Association since 2013. In 2014, he co-founded the St. Thomas Aquinas Guild of the Quad Cities, a chartered guild of the Catholic Medical Association, where he has been serving as vice president ever since.

110. Dr. Porubcin practices medicine in accordance with the Catholic Ethical and Religious Directives (ERDs). Thus, he objects to all forms of assisted suicide (aka "medical aid in dying") or active euthanasia. He understands the role of physicians should be to extend life, cure illnesses, or, if incurable, ease the suffering of their patients. Consistent with his Catholic conviction, he understands that giving patients a substance with the primary *intent* of ending their lives prematurely is morally wrong.

111. Over the course of his career, Dr. Porubcin has treated numerous patients with incurable cancer in need of pain-relieving medications. Some of those patients have expressly told him, "I want to die." Usually, they no longer wished to travel for medical care, were depressed, or believed that they were only a burden to their loved ones. In those situations, Dr. Porubcin has sought to encourage them, treat their depression, and do everything as he was trained to ease their suffering, short of actively ending their lives.

112. Because of his faith, Dr. Porubcin cannot and will not comply with EOLO's requirements to facilitate assisted suicide in similar situations in the future. Specifically, he will not inform his cancer patients of the alleged "benefits" of assisted suicide, nor refer or transfer them to a practitioner or another third party for the purpose of ending their own lives. If a patient insists, Dr. Porubcin will advise them to independently find another doctor and transfer their medical records in accord with ERD No. 27.

113. Dr. Porubcin also will not be dishonest with death certificates in accord with EOLO's command that a patient's "act of self-administering medication prescribed pursuant to this Act shall not be indicated on the death certificate."

38

114. Dr. Porubcin will not record in a patient's medical record the request for assisted suicide and notice of his inability to carry out the patient's request, insofar as this triggers the "qualifying" process with another practitioner. 410 ILCS 22/70(b)(1), 22/35.

115. Additionally, Dr. Porubcin will not refrain from talking to patients about end-of-life treatment options that do *not* include, let alone discuss the so-called "benefits of," assisted suicide, as ostensibly required by EOLO's bar on health care professionals from "[i]ntentionally misleading a patient."

116. He also will not refrain from calling "assisted suicide" exactly that in appropriate circumstances—contrary to EOLO's command that "Actions taken in accordance with this Act do not, for any purposes, constitute suicide, assisted suicide, [or] euthanasia," in combination with its prohibition on intentionally or knowingly "coercing or exerting undue influence on a patient . . . to . . . not use medication pursuant to this Act."

117. Therefore, because EOLO takes effect on September 12th, Dr. Porubcin urgently needs injunctive relief to continue treating cancer patients in Illinois consistent with his sincerely held religious objection (consistent with nearly two millennia of law and medicine) to facilitating assisted suicide in any way.

### *Dr. Mary Keen Kirchoff*

118. Dr. Keen Kirchoff has been a practicing Catholic physician for more than 40 years. She graduated from medical school at Northwestern University Feinberg School of Medicine in 1979, before completing residencies in pediatrics at Loyola University Medical Center and in physical medicine and rehabilitation at the University of Washington.

119. She regularly treats patients with severe impairments and disabilities, including patients who are on ventilators or who have cerebral palsy. Although the brain injury underlying

39

cerebral palsy is non-progressive, adults with this impairment can experience premature aging such as early onset of muscle loss, along with chronic pain and functional loss.

120.     Dr. Keen Kirchoff is a devoted Catholic. She and her husband have regularly attended daily Mass together for many years. Her Catholic faith inspired her to pursue the practice of medicine and specialize in rehabilitation services as a way of treating the neediest among us, in response to Christ's call in Matthew 25:40-45.

121.     Dr. Keen Kirchoff first joined the Catholic Medical Association in 1979. She has been the president of her local Catholic Medical Association guild (the Augustus Tolton Guild) for the past 10 years. As president, she regularly leads meetings that discuss pressing ethical issues in medicine. She has also specifically written about assisted suicide in the context of Catholic Social Teaching, observing, among other things, that vulnerable patients can often become pressured or coerced into seeking assisted suicide through their insurance companies' denial of coverage for needed treatments, leaving assisted suicide as the cheapest available "treatment."[30]

122.     Dr. Keen Kirchoff practices medicine in accordance with the Catholic ERDs. Thus, she objects to all forms of assisted suicide or active euthanasia. She understands the role of physicians should be to extend life, cure illnesses, or, if incurable, ease the suffering of their patients. Consistent with her Catholic convictions, she understands that giving patients a substance with the primary *intent* of ending their lives prematurely is morally wrong.

123.     As a result, Dr. Keen Kirchoff cannot comply with EOLO's mandates to facilitate assisted suicide. Specifically, she cannot and will not: inform patients of the alleged "benefits" of

---

[30] Dr. Mary Keen Kirchoff, "Physician Assisted Suicide from the Perspective of Catholic Social Teaching," The Pulse of Catholic Medicine, March 10, 2024, https://www.cathmed.org/the-pulse/physician-assisted-suicide-from-the-perspective-of-catholic-social-teaching/.

40

assisted suicide and, upon their request, refer or transfer them to a practitioner or another third party for the purpose of ending their own lives.

124. If a patient asks about or requests assisted suicide, Dr. Keen Kirchoff will converse with the patient about why he or she is raising that question. Dr. Keen Kirchoff understands that a desire for assisted suicide can arise when patients feel they are a burden on others, or are depressed, fear a loss of control, or cannot afford other treatments. Dr. Keen Kirchoff would seek to address that underlying concern. If a patient insists on assisted suicide, he or she (or the patient's surrogate) would need to independently choose a different health care professional or health care facility, to whom Dr. Keen Kirchoff could transfer the patient's records in accord with ERD No. 27.

125. Dr. Keen Kirchoff will not lie on death certificates as required by EOLO's command that a patient's "act of self-administering medication prescribed pursuant to this Act shall not be indicated on the death certificate."

126. She also will not record in a patient's medical record the request for assisted suicide and notice of her inability to carry out the patient's request insofar as this triggers the "qualifying" process with another practitioner. 410 ILCS 22/70(b)(1); 22/35.

127. Dr. Keen Kirchoff will not refrain from talking to patients about end-of-life treatment options that do *not* include, let alone discuss the so-called "benefits" of, assisted suicide—as otherwise ostensibly required by EOLO's bar on health care professionals from "[i]ntentionally misleading a patient."

128. Nor will Dr. Keen Kirchoff refrain from calling "assisted suicide" exactly that in

appropriate circumstances and distinguishing it from available end-of-life care[31]—contrary to EOLO's command that "Actions taken in accordance with this Act do not, for any purposes, constitute suicide, assisted suicide, [or] euthanasia," in combination with its prohibition on intentionally or knowingly "coercing or exerting undue influence on a patient . . . to . . . not use medication pursuant to this Act."

129. Therefore, because EOLO's mandates take effect on September 12th, Dr. Keen Kirchoff is in urgent need of injunctive relief to continue treating patients in accord with her Catholic understanding of the dignity of human life and thus her inability to promote or otherwise cooperate in assisted suicide in any way.

### *Dr. Michael Hawking*

130. Dr. Hawking is a hematologist, oncologist, and clinical ethicist practicing in Chicago. He takes special care to provide leading-edge and compassionate treatment that involves honest bi-directional conversations, listening to patient concerns, and shared decision-making. He regularly treats patients with terminal diagnoses.

131. Dr. Hawking graduated from the University of Michigan Medical School in 2016, after having obtained a Master of Science degree in Comparative Social Policy from the University of Oxford and a BA in philosophy from the University of Notre Dame. He completed his residency and fellowship programs at the University of Chicago Medical Center. Today, Dr. Hawking practices oncology and is a teaching faculty member at a nationally prominent medical school.

132. Dr. Hawking regularly presents about and sits on panels discussing assisted

---

[31] *See* Keen Kirchoff, *supra n. 30* (expressly discussing "alternatives" to "suicide" such as "[p]alliative care and hospice").

suicide and euthanasia. As noted, he has previously authored scholarship analyzing legalized assisted suicide in Western and Northern Europe.[32] Dr. Hawking understands as a trained physician and ethicist that, consistent with the Hippocratic Oath, he is to "first, do no harm" to his patients. "Nor can [he] give a lethal drug to anyone if . . . asked, nor . . . advise such a plan." *See supra*, ¶ 1. He understands the role of physicians is to extend life, cure illnesses, or, if incurable, ease the suffering of his patients—not to intentionally facilitate their deaths.

133. Dr. Hawking is also a committed Catholic and practices medicine in accordance with Catholic teaching and the Catholic ERDs. Given his Catholic faith and his prior background in euthanasia policy, Dr. Hawking is a keynote speaker at the Illinois Catholic Health Association's upcoming annual meeting on the topic of assisted suicide. Consistent with his Catholic convictions, he understands that giving patients a substance with the primary *intent* of ending their lives prematurely is morally wrong.

134. Dr. Hawking's commitments as a physician and as a Catholic mean that he cannot comply with EOLO's mandates to actively facilitate assisted suicide. Specifically, he cannot and will not inform patients of the alleged "benefits" of assisted suicide as an available "treatment option." Nor can he refer or transfer them to another provider or third party for the purpose of intentionally facilitating their own deaths. If a patient insists, Dr. Hawking will advise them to independently find another doctor and transfer their medical records in accord with ERD No. 27.

135. Dr. Hawking will not lie on death certificates as required by EOLO's command that a patient's "act of self-administering medication prescribed pursuant to this Act shall not be

---

[32] *See* Dr. Michael Hawking, "Autonomy, dignity, and culture: Reflections on euthanasia in Belgium and the Netherlands," Studies on life, human dignity and law: Seminars at Real Colegio Complutense at Harvard University, September 24-26, 2015, 2017, ISBN 978-84-99119-634-1, pgs. 175-183 (2017).

indicated on the death certificate."

136. Dr. Hawking also will not record in a patient's medical record his or her request for assisted suicide and notice of his inability to carry out the patient's request insofar as this triggers the "qualifying" process with another provider. 410 ILCS 22/70(b)(1); 22/35.

137. Dr. Hawking will not refrain from talking to patients about end-of-life treatment options that do *not* include, let alone discuss the so-called "benefits" of, assisted suicide—as otherwise ostensibly required by EOLO's bar on health care professionals from "[i]ntentionally misleading a patient."

138. Nor will Dr. Hawking refrain from calling "assisted suicide" exactly that in appropriate circumstances and distinguishing it from end-of-life care—contrary to EOLO's Orwellian command that "Actions taken in accordance with this Act do not, for any purposes, constitute suicide, assisted suicide, [or] euthanasia," in combination with its prohibition on intentionally or knowingly "coercing or exerting undue influence on a patient . . . to . . . not use medication pursuant to this Act."

139. Therefore, because EOLO's mandates take effect on September 12th, Dr. Hawking is in urgent need of injunctive relief to continue treating patients in accord with his Catholic understanding of the dignity of human life and thus his inability to promote or otherwise cooperate in assisted suicide in any way.

### *Dr. Brian Couri*

140. Dr. Couri has been practicing medicine for more than 30 years. He graduated from Southern Illinois University School of Medicine in 1995 and completed his residency at Rush Medical College.

141. As a specialist in physical and rehabilitation medicine, he regularly treats patients

with chronic pain and degenerative conditions, including back, neck, joint, and nerve disorders along with musculoskeletal conditions. His goal is to reduce pain and promote long-term healing. He regularly treats elderly patients as part of his practice.

142. Dr. Couri is a believing Catholic. He has been a member of the Catholic Medical Association and previously sat on the Bishop's Advisory Board for Pro-Life Activities for the Diocese of Joliet.

143. Dr. Couri practices medicine in accordance with Catholic teaching and the Catholic ERDs. Thus, he objects to all forms of assisted suicide or active euthanasia. He understands the role of physicians should be to extend life, cure illnesses, or, if incurable, ease the suffering of patients. Consistent with his Catholic convictions, he understands that giving patients a substance with the primary *intent* of ending their lives prematurely is morally wrong.

144. Dr. Couri previously had a patient with debilitating chronic pain that made it infeasible to get out of bed, and the patient eventually transferred to hospice. Had EOLO been in force, Dr. Couri could not have advised that patient of the availability and so-called "benefits" of assisted suicide and referred the patient for the same. Nor, if the patient had requested assisted suicide, could Dr. Couri have evaluated and qualified the patient for the same or referred the patient to a third party to facilitate that process.

145. Following EOLO's adoption, Dr. Couri likewise cannot and will not inform current and future patients of assisted suicide's alleged "benefits" and, upon their request, refer or transfer them to a practitioner or another third party for the purpose of ending their own lives.

146. If a patient asks about or requests assisted suicide, Dr. Couri will converse with the patient about why he or she is raising that question. Dr. Couri understands that a desire for assisted suicide among his patients would likely arise from depression. Dr. Couri would seek to

45

address that underlying concern rather than facilitate assisted suicide. If a patient insists on assisted suicide, the patient could independently choose to transfer to another health care professional. Dr. Couri understands that because of the modern prevalence of electronic medical records, transferee health care professionals or facilities would generally already have access to such patients' records.

147. Dr. Couri also will not record in a patient's medical records a request for assisted suicide and notice of his inability to carry out the patient's request insofar as this triggers the "qualifying process" with another provider. 410 ILCS 22/70(b)(1); 22/35.

148. Dr. Couri will not refrain from talking to patients about end-of-life treatment options that do *not* include, let alone discuss the so-called "benefits" of, assisted suicide—as otherwise ostensibly required by EOLO's bar on health care professionals from "[i]ntentionally misleading a patient."

149. Nor will Dr. Couri refrain from calling "assisted suicide" exactly that in appropriate circumstances and distinguishing it from available end-of-life care—contrary to EOLO's command that "Actions taken in accordance with this Act do not, for any purposes, constitute suicide, assisted suicide, [or] euthanasia," in combination with its prohibition on intentionally or knowingly "coercing or exerting undue influence on a patient . . . to . . . not use medication pursuant to this Act."

150. Therefore, because EOLO's mandates take effect on September 12th, Dr. Couri is in urgent need of injunctive relief to continue treating patients in accord with his Catholic understanding of the dignity of human life and thus his inability to promote or otherwise cooperate with assisted suicide in any way.

### *Bishop Thomas John Paprocki*

151.    Bishop Paprocki has been Bishop of the Diocese of Springfield in Illinois since 2010.

152.    The Diocese of Springfield in Illinois is the locus of hospitals within the two largest Catholic hospital systems in Illinois—the Hospital Sisters Health System (HSHS) and OSF HealthCare.

153.    HSHS was founded by the Hospital Sisters of St. Francis in Springfield, who, after immigrating from Germany, originally opened four hospitals in Illinois in 1875.[33] They also opened the first Catholic nursing home program in the United States in Springfield in 1886, which still operates to this day.[34] And in 1978 they created HSHS,[35] which today has become a regional hospital system across Illinois and Wisconsin, with 10 hospitals in Illinois.[36] Their ministry seeks to provide "special attention to our brothers and sisters who are poor, underserved and most vulnerable," with a "commit[ment] to continuing the healing ministry of Jesus Christ."[37] HSHS serves a vast number of elderly patients through its system-wide services including home health, hospice, and pharmacy services.[38]

154.    OSF HealthCare serves more than one million patients annually across Illinois,[39]

---

[33] https://www.hshs.org/about/our-history; Valerie Schremp Hahn, "Hospital Sisters of St. Francis gather to celebrate 150-year legacy that started in Germany," Catholic Health Association of the United States, Nov. 18, 2025, https://www.chausa.org/news-and-publications/publications/catholic-health-world/archives/november-2025/hospital-sisters-of-st.-francis-gather-to-celebrate-150-year-legacy-that-started-in-germany.

[34] http://hospitalsisters.org/index.cfm?pID=3642&redirectedFrom=443.

[35] Hospital Sisters Health System, Our Mission and Heritage, May 2011, at pg. 17, https://st-johns.libguides.com/ld.php?content_id=27426548.

[36] https://www.hshs.org/locations.

[37] https://www.hshs.org/about/mission-and-values.

[38] https://www.hshs.org/services.

[39] https://www.osfhealthcare.org/patients-visitors/about/facts-figures.

including in Springfield and Alton. It was originally started by six Third Order Franciscan sisters in a three-story house in Peoria in 1876.[40] Today, it operates a multi-state system with 18 inpatient facilities including 16 hospitals—15 in Illinois and one in Michigan.[41] It also operates OSF Home Care Services, which includes eight home health agencies and eight hospice agencies including an inpatient hospice home and home infusion pharmacy.[42] OSF also provides pharmacy services, including retail pharmacies and drug disposal boxes at each of its hospitals.[43] It seeks to operate "[i]n the spirit of Christ and the example of Francis of Assisi" in its provision of health care services, including by "[e]mbracing God's great gift of life" and serving with love and compassion in carrying out "the healing ministry of Christ and His Church to the *total person.*"[44]

155.    As noted, as part of his religious duties, Bishop Paprocki is "ultimate[ly] responsib[le]" for ensuring Catholic hospitals in his Diocese follow the ERDs. *See* ERDs at pg. 32; *see also* USCCB, *The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry*, at pg. 3 (2d ed. 2020).[45] Indeed, "[a]s the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists." ERDs at pg. 37. "As teacher, the diocesan

---

[40] https://www.osfhealthcare.org/patients-visitors/about/history.
[41] https://www.osfhealthcare.org/patients-visitors/about;
https://www.osfhealthcare.org/locations?locationtypes=Hospital.
[42] *Ibid.*
[43] https://www.osfhealthcare.org/services/patient/pharmacy.
[44] https://www.osfhealthcare.org/patients-visitors/about/mission-vision-values.
[45]
https://www.usccb.org/resources/The%20Pastoral%20Role%20of%20the%20Diocesan%20Bishop%20in%20Catholic%20Health%20Care%20Ministry%202_0.pdf

bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese." *Ibid.*

156. Indeed, following the publication of the seventh edition of the ERDs in December 2025, Bishop Paprocki issued a "General Decree" promulgating that edition as "particular law" in his Diocese effective January 1, 2026, "any particular legislation, directives, or instructions to the contrary notwithstanding." The Decree ordered that the seventh edition of the ERDs be published on the Diocese of Springfield's website and delivered (along with the Decree) to the CEOs and sponsors of all Catholic health institutions in the Diocese. Bishop Paprocki then sent the ERDs, his Decree, and cover letters to the presidents of both OSF St. Anthony's Health Center in Alton and of HSHS in Springfield.

157. "Particular laws" "oblige" Catholics in a bishop's diocese.[46] Here, Bishop Paprocki's particular law with respect to the ERDs requires HSHS and OSF hospitals in his diocese to follow the ERDs over any legislation to the contrary.

158. Because EOLO requires hospitals to counsel patients on assisted suicide's alleged benefits and refer for it—along with allowing its health care practitioners to promote or even engage in assisted suicide, and refraining from "deploy[ing] misinformation to obstruct access to" assisted suicide—it directly interferes with Bishop Paprocki's religious duty to ensure Catholic hospitals in his Diocese follow the ERDs, including their requirement to not facilitate (and thus not refer) for assisted suicide.

159. EOLO's operation against even Catholic hospitals objecting to any participation in assisted suicide interferes with Bishop Paprocki's internal church governance of his Diocese—

---

[46] Code of Canon Law c. 8, § 2.

49

particularly his responsibility to ensure Catholic health ministries in his jurisdiction express the healing ministry of Christ and thus comply with the ERDs.

160. Thus, Bishop Paprocki is in urgent need of injunctive relief to continue ensuring Catholic hospitals in his Diocese comply with the ERDs with respect to assisted suicide.

### *Lutheran Care Center*

161. The Altamont Lutheran Care Center originally opened as the Pleasant Acres Nursing Home in 1969.[47] Due to its fast-growing reputation for high-quality skilled nursing care and rehabilitation services, it opened a new wing in 1975 before being acquired by a group of Lutheran churches and incorporated as the Lutheran Care Center in 1980. It established a hospice program within the facility in 1982, and today it contracts with Sarah Bush Lincoln Hospice as well as Hospital Sisters Health System Hospice to provide hospice services to its in-house residents.

162. The Lutheran Care Center Chapel also opened on site in 2001. Today the Lutheran Care Center is owned and supported by 20 area Lutheran churches. It has provided skilled nursing care for nearly 3,000 people over the years. It is also one of the biggest employers in Altamont.

163. The Lutheran Care Center views its nursing home services as "reveal[ing] the living presence of the Lord," and as a true carrying out of the "mission of the church."[48]

164. The Lutheran Care Center opposes assisted suicide in all its forms and any cooperation with it. Accordingly, it would violate the Lutheran Care Center's religious convictions to be forced to:

---

[47] https://altamontlcc.org/history/.
[48] https://altamontlcc.org/.

- discuss the alleged "benefits" of assisted suicide and, upon request, "refer" or "transfer" patients to health care professionals, facilities, or third parties for the purposes of facilitating assisted suicide;

- adopt "written access to care and information protocols" requiring that its health care providers similarly discuss assisted suicide's supposed "benefits" with the Lutheran Care Center's patients and refer or transfer them for the specific purpose of obtaining assisted suicide, or provide written "information to the patient about other health care providers who they reasonably believe may offer" assisted suicide;

- allow health care professionals to promote, recommend, refer for, and provide information about how to obtain resources to access assisted suicide.[49] 410 ILCS 22/65(e)(1)-(2);

- refrain from allegedly "deploy[ing]" so-called "misinformation to obstruct access to" assisted suicide, insofar as that entirely vague proscription forbids distinguishing palliative care that may *incidentally* hasten death through the administration of pain medications and "assisted suicide" which aims to *intentionally* hasten a person's death—particularly given EOLO's separate provision that "[a]ctions taken in accordance with this Act do not, for any purposes, constitute . . . assisted suicide." 410 ILCS 22/100(b).

- record in a patient's medical record his or her request for assisted suicide and notice of its inability to carry out the patient's request insofar as it constitutes a request triggering the "qualifying" process with another provider. 410 ILCS 22/70(b); 22/35.

165. The Lutheran Care Center, like any facility, cannot prevent residents from transferring for any reason; it is their right to choose where they reside. But EOLO will violate the Lutheran Care Center's religious convictions by forcing it to refer residents directly to a provider or third party who is "able and willing" to or whom the Lutheran Care Center "reasonably believes" will facilitate assisted suicide.

---

[49] Although nurses are not "health care professionals" as defined by EOLO, 410 ILCS 22/10, EOLO broadly forbids entities like the Lutheran Care Center from prohibiting *any* covered health care professional from promoting assisted suicide to its patients, even if a physician, for example, is providing services to a patient at its facility. Of course, non-physician health care personnel are still expected to discuss assisted suicide's alleged "benefits" and refer for it under the written protocols required by the HCRCA, as incorporated by EOLO.

166.     The Lutheran Care Center agrees with the Position Statement of the Lutherans for Life that it must "resist the demands of authorities . . . to participate" in assisted suicide—that is, it must obey God rather than man on this most critical matter of life and death.[50]

167.     EOLO's contrary commands thus threaten to severely damage or eradicate the Lutheran Care Center's long-established skilled nursing services in southern Illinois, to the irreparable detriment of innumerable patients (including those seeking such faith-based skilled nursing care in southern Illinois) and the Altamont community alike. The Lutheran Care Center thus urgently needs injunctive and declaratory relief preserving its ability to continue providing Christ-centered nursing home care consistent with its views on the dignity of human life and thus its inability to cooperate with assisted suicide in any way.

## COUNTS

### Count I
### (by all Plaintiffs)
### 42 U.S.C. § 1983
### Violation of Free Speech Under the First Amendment

168.     All preceding paragraphs are incorporated by reference.

169.     The First Amendment prohibits the government from coercing an individual to speak contrary to his or her beliefs on a significant issue of personal conviction in order to eliminate ideas that differ from the government's own. *303 Creative v. Elenis*, 600 U.S. 570, 598 (2023).

170.     The First Amendment prohibits the government from taking sides on whose speech is sanctionable and whose speech is immunized. *NIFLA v. Raoul*, 685 F. Supp. 3d 688, 695 (N.D. Ill. 2023).

---

[50] Position Statement, at pgs. 34-35, https://lutheransforlife.org/wp-content/uploads/2020/06/Position_Statements_Lutherans_For_Life_7-27-26.pdf.

171. These First Amendment protections extend to licensed professionals much as they do to everyone else. *Chiles v. Salazar*, 146 S. Ct. 1010, 1022 (2026); *NIFLA v. Becerra*, 585 U.S. 755, 766-67 (2018).

172. The protections of the First Amendment are applicable to the States through the Fourteenth Amendment.

173. Plaintiffs recognize and believe, consistent with the Hippocratic Oath and their sincerely held religious and moral beliefs, that suicide and assisted suicide are gravely immoral.

174. For the same reasons, Plaintiffs recognize and believe that participating in assisted suicide in any way, including by advising their patients about its so-called "benefits" and making "referrals" for it, is likewise gravely immoral.

175. Plaintiffs believe, consistent with their sincerely held religious and moral beliefs, that it is gravely immoral to certify to a lie.

176. These are significant issues of personal conviction.

177. EOLO and HCRCA require health care entities and health care professionals to inform patients of the alleged "benefits" of assisted suicide as a possible "treatment option" and "at a minimum" "refer" patients to health care professionals who are "able and willing to evaluate and qualify" the person for assisted suicide, or to third parties "to assist the requesting individual in seeking" assisted suicide.

178. The HCRCA, incorporated by reference in EOLO, requires health care professionals to provide a patient "writ[ten] information . . . about other health care providers who they reasonably believe may offer" assisted suicide.

179. EOLO provides that "intentionally misleading" a patient constitutes "undue influence" or "coercion," while also providing that "Actions taken in accordance with this Act do

53

not, for any purposes, constitute . . . assisted suicide."

180.  EOLO provides that "undue influence" and "coercion" include "prevent[ing] a qualified patient . . . from obtaining" assisted suicide "in a manner that conflicts with the Health Care Right of Conscience Act."

181.  EOLO provides that a health care entity "deploying misinformation to obstruct access to"—but not to facilitate—assisted suicide "constitutes coercion or undue influence."

182.  EOLO ostensibly prohibits health care professionals from encouraging patients to choose options other than "assisted suicide."

183.  EOLO requires health care entities and professionals to record a patient's request for assisted suicide and the inability to participate in his or her medical record as a predicate step in the qualifying process with another practitioner.

184.  EOLO prohibits physicians from indicating on any death certificate that a deceased person died from self-administered substances. Instead, the statute requires that "the death shall be attributed to the underlying terminal disease."

185.  EOLO removes any protection from civil and criminal liability for violating its terms.

186.  EOLO expressly provides that civil and criminal liability can "aris[e] from" violating its prohibition on "undue influence" and "coercion."

187.  The HCRCA removes its own conscience protections for a health care facility's failure to adopt written protocols requiring health care personnel to discuss the alleged "benefits" of and refer, transfer, or provide written information about "treatment options" that violate the facility and/or professional's conscience—including assisted suicide under EOLO.

188.  Defendant Treto has judicially admitted that refusing to discuss the alleged

54

"benefits" of and "refer" for an available legal "treatment option" violates a "fundamental requirement of medical practice."

189. Violating EOLO's compelled speech mandates can thus trigger discipline under the Medical Practice Act, the Nursing Home Care Act, the Hospital Licensing Act, and other laws or regulations governing the licenses or credentials of health care personnel.

190. Under EOLO and HCRCA, Plaintiffs are chilled or subject to liability, discipline, or punishment for speaking their understanding that suicide and assisted suicide are not a legitimate treatment option at any time for any disease.

191. Under EOLO and HCRCA, the physician Plaintiffs are unable to certify to the truth on a death certificate about the cause of death of someone who dies by assisted suicide.

192. EOLO and HCRCA compel and restrict Plaintiffs' speech based on content.

193. EOLO and HCRCA compel and restrict Plaintiffs' speech based on viewpoint.

194. Viewpoint discrimination is an egregious form of content discrimination. *Chiles*, 146 S. Ct. at 1022.

195. EOLO and HCRCA violate the First Amendment because they improperly regulate speech on the basis of content and viewpoint, and the state has lesser restrictive means for accomplishing its interests than Orwellian speech mandates, such as a public-information campaign without imposing its viewpoint on Plaintiffs. *NIFLA v. Becerra*, 585 U.S. 755, 775 (2018).

196. Plaintiff Lutheran Care Center has the duty and right to speak in accordance with its mission. By requiring it to allow employees to speak and act contrary to that message, EOLO and HCRCA infringe on its free speech rights, forcing it to host and facilitate a message that violates its faith. *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S.

557 (1995).

197.    Plaintiff Bishop Paprocki has the duty and right to ensure Catholic hospitals in his jurisdiction speak in accordance with their Diocese's shared mission. By requiring Catholic hospitals in his Diocese to allow employees to speak and act contrary to that message, EOLO and HCRCA infringe on his free speech rights, requiring him (through his Catholic hospitals) to host and facilitate a message that violates his faith and responsibilities as Bishop.

198.    The Lutheran Care Center, Bishop Paprocki, and the physician Plaintiffs maintain close relationships with their current and prospective terminally ill patients, who are not readily identifiable or able to assert their own rights in a timely fashion.

199.    The State has no compelling, significant, or legitimate interest in forcing people and entities to speak its preferred message under EOLO and HCRCA.

200.    EOLO and HCRCA are not narrowly tailored.

201.    Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count II
(by all Plaintiffs)
42 U.S.C. § 1983
Violation of Freedom of Association Under the First Amendment**

202.    All preceding paragraphs are incorporated by reference.

203.    The First Amendment guarantees a right to freely associate with others.

204.    The constitutional right to associate with others includes the right of like-minded religious people to associate with each other.

205.    The freedom of association protects the right of expressive associations to associate with those who advance, and do not harm, their expression. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 858, 862-63 (7th Cir. 2006).

56

206. The Lutheran Care Center is an expressive association whose purpose is providing and advocating for Christian health care in a manner consistent with its religious convictions on the sanctity of life, including end-of-life care.

207. Catholic hospitals in Bishop Paprocki's diocese are expressive associations whose purpose is carrying out the healing ministry of Christ in accord with the Bishop's implementation of the Catholic ERDs, including with respect to the sanctity of life and thus end-of-life care.

208. In order to maintain this expression consistently, the Lutheran Care Center and Catholic hospitals in Bishop Paprocki's diocese must be able to hire only those who agree to respect their religious standards regarding matters concerning the sanctity of human life, end-of-life care, and assisted suicide.

209. This expression includes Plaintiffs' view that assisted suicide is not a legitimate treatment option and that it is morally wrong to inform patients about the "benefits" of suicide as "treatment" and to "refer" for or "transfer" to assisted suicide practitioners.

210. The religious beliefs of the Lutheran Care Center and Bishop Paprocki about treating patients with dignity and the sanctity of life are central to their religious mission.

211. EOLO forces the Lutheran Care Center and Catholic hospitals under Bishop Paprocki's authority to hire or retain, and prohibits them from taking adverse action against, health care practitioners whose words or conduct would undermine their religious expression with respect to assisted suicide, such as by advocating for actions inconsistent with their religious beliefs and messages. *See* 410 ILCS 22/65(e); 22/70(c)-(d). This will force the Lutheran Care Center and Bishop Paprocki via the Catholic hospitals under his authority into expressive associations that directly undermine and contradict their religious expression and the way of providing care that is central to their religious mission.

212. The requirements of EOLO and HCRCA could force the Lutheran Care Center and Catholic hospitals in Bishop Paprocki's diocese to hire practitioners and personnel who take actions opposed to their religious mission with respect to assisted suicide.

213. EOLO and HCRCA could leave the Lutheran Care Center and the Catholic hospitals in Bishop Paprocki's diocese unable to fire or otherwise discipline employees and volunteers who oppose and undermine their religious missions on the matter of assisted suicide.

214. Through their referral mandates, EOLO and the HCRCA also compel Plaintiffs to associate with the practitioners and entities that embrace assisted suicide. To comply, Plaintiffs must investigate which practitioners and entities are "able and willing" to facilitate assisted suicide, maintain a working knowledge of and relationships with those suicide-ready providers, select among them, and then formally connect their own patients to them for the very purpose of obtaining assisted suicide. Plaintiffs are thus conscripted into a functional and visible partnership with—and made an instrument of—the very practitioners and entities whose defining practice Plaintiffs' religious missions vigorously oppose.

215. Some of the current and prospective patients served by the Lutheran Care Center, the Catholic hospitals under Bishop Paprocki's authority, and the physician Plaintiffs wish to receive and associate with health care communities who agree to follow their religious conduct standards regarding matters concerning the sanctity of human life, including assisted suicide.

216. This expression of belief includes the view that assisted suicide is not a legitimate treatment option and is inconsistent with human dignity and the sanctity of life.

217. If these patients are forced to seek end-of-life care from practitioners whose words or conduct would undermine their religious expression, such as by advocating for actions inconsistent with their shared religious beliefs and messages, they would be forced into

expressive associations that undermine and contradict their religious expression.

218. These patients wish to exercise their associational rights by living out their final days in the company of those who will not tell them, explicitly or implicitly, that suicide is a legitimate treatment option that has "benefits."

219. By forcing patients to associate with those speaking a message that suicide is a legitimate option, Defendants have burdened those rights.

220. The Lutheran Care Center, the Catholic hospitals under Bishop Paprocki's authority, and the physician Plaintiffs maintain close relationships with their current and prospective terminally ill patients, who are not readily identifiable or able to assert their own rights in a timely fashion.

221. Defendants have no compelling, significant, or legitimate interest justifying the infringement on Plaintiffs, their associated practitioners, and the patients they serve.

222. Defendants have not used the least-restrictive or otherwise narrowly tailored means of advancing any purported compelling interest.

223. Plaintiffs and the current and prospective patients they serve will be harmed absent injunctive and declaratory relief.

**Count III**
**(by all Plaintiffs)**
**42 U.S.C. § 1983**
**Violation of Free Exercise of Religion Under the First Amendment**

224. All preceding paragraphs are incorporated by reference.

225. The Free Exercise Clause protects religious beliefs and acts in accordance with those beliefs.

226. The government can neither prohibit religious exercise outright, nor pressure an individual to forego his or her religious exercise.

59

227. Where the government—directly or indirectly—makes it impossible for an individual to participate in his or her religious expression, requires compromising religious belief as a condition to receiving an important benefit, or denies a benefit because of religious belief, the government has substantially burdened that religious exercise.

228. The burden is particularly heavy when an individual is unable to engage in protected religious exercise in the final moments of his or her life.

229. As a matter of religious faith and doctrine, Plaintiffs believe assisted suicide is gravely sinful, and thus they cannot tell patients or prospective patients about the so-called "benefits" of committing suicide or "refer" anyone to someone who would assist suicide. Nor can they knowingly facilitate assisted suicide in any other way, including by recording the patient's request for assisted suicide as a trigger for the qualification process; lying on death certificates; or conflating "assisted suicide" with other forms of moral, legitimate end-of-life care.

230. EOLO and HCRCA substantially burden the religious rights of Plaintiffs by compelling participation in speech and expressive conduct their faith forbids.

231. EOLO and HCRCA are not neutral and generally applicable.

232. By compelling speech and conduct to facilitate assisted suicide only for "terminally ill" patients, EOLO fails to regulate comparable activity relative to the State's stated interest in easing suffering and providing an alternative option for patients who seek to retain autonomy and control over when they die. 410 ILCS 22/5(a). Indeed, numerous patients who are not terminally ill may be suffering even greater physical or psychological pain but lack eligibility for assisted suicide, and their attending physicians do not necessarily have a duty to inform them about assisted suicide's alleged "benefits" and refer for it upon request. EOLO is thus

underinclusive as to its purposes and neither neutral nor generally applicable.

233. Similarly, EOLO's definition of "terminally ill" also renders the law non-generally applicable. A patient who receives a diagnosis that, within reasonable medical judgment, will result in death in seven months to one year, for example, cannot be qualified for assisted suicide—and thus their attending physicians or health care facilities (assuming they object to assisted suicide) need not refer or transfer them to, or provide them written information about, other health care practitioners who will assist in their own suicides. This reality undermines the state's asserted interest in providing "an additional end-of-life care option for terminally ill individuals." Indeed, it requires many such individuals to potentially *prolong* their suffering.

234. EOLO also lacks general applicability insofar as only certain "health care professionals" and "entities" are obliged to promote and refer for assisted suicide to their patients and residents. 410 ILCS 22/10. Assisted living facilities, for example, are not covered "health care entities" required to discuss assisted suicide's alleged "benefits" to their residents or refer for it upon request, even if a resident receives a qualifying terminal diagnosis. And only physicians, pharmacists, and licensed mental health professionals are covered "health care professionals" directly subject to EOLO's compelled speech mandate. Although EOLO also incorporates the HCRCA's employer protocol requirement applicable broadly to "health care personnel," 745 ILCS 70/3, 70/6.1, it does not itself directly mandate all "health care personnel" to promote and refer for assisted suicide, even if asked to do so by a patient or resident nearing the end of life and/or after having been diagnosed with a terminal illness with less than six months to live. *See, e.g.*, 410 ILCS 22/95(a)(3) (undue influence and coercion includes "[i]ntentional misconduct by a [covered] health care professional or health care entity").

61

235. Illinois law elsewhere expressly protects the very practices EOLO now forbids. The Hospital Licensing Act excludes from its definition of prohibited interference with an employed physician's professional judgment both "written statements of ethical or religious directives" and "reasonable referral restrictions" that do not adversely affect the health or welfare of the patient. 210 ILCS 85/10.8(b)(3)-(4). Illinois thus recognizes—for every medical service except assisted suicide—that religious directives and employer referral restrictions are legitimate features of hospital practice. EOLO's contrary treatment of assisted-suicide objections alone is neither neutral nor generally applicable.

236. EOLO's lack of neutrality and general applicability triggers strict scrutiny.

237. The State lacks a compelling interest in applying EOLO's mandates to Plaintiffs while "leav[ing] appreciable damage to [its] supposedly vital interest" in easing suffering and providing an alternative "end-of-life treatment option" unprohibited. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).

238. Many of the current and prospective patients served by Plaintiffs believe that assisted suicide is gravely sinful, do not want to hear health care practitioners tell them about the so-called "benefits" of committing suicide, and do not want to be "referred" to someone who would assist the patient to commit suicide.

239. EOLO and HCRCA substantially burden these patients' rights to approach death consistent with their faith. Their attending health care practitioner would be required to discuss assisted suicide as a beneficial treatment option, during a particularly vulnerable time, and the patients may have no interest in—and may feel betrayed by—hearing their trusted health care practitioner suggest that they consider an irrevocable and immoral course of action that their faith forbids.

240.    Illinois law forces these religious patients to make a fundamentally unfair choice: either seek end-of-life care from a practitioner who will discuss the option of suicide and its "benefits" with them as a legitimate medical treatment, or forego end-of-life care altogether.

241.    Defendants have no compelling interest justifying the infringement on the free exercise of religion.

242.    Defendants have not used the least-restrictive means of advancing any purported compelling interest.

243.    The Lutheran Care Center, the Catholic hospitals under Bishop Paprocki's authority, and the physician Plaintiffs maintain close relationships with their current and prospective terminally ill patients, who are not readily identifiable or able to assert their own rights in a timely fashion.

244.    Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count IV**
**(by all Plaintiffs)**
**42 U.S.C. § 1983**
**Violation of Due Process Under the Fourteenth Amendment**

245.    All preceding paragraphs are incorporated by reference.

246.    The Due Process Clause of the Fourteenth Amendment prohibits the government from defining statutory terms contrary to their ordinary meaning in a way that deprives persons of fair notice of the law's scope and allows for arbitrary and discriminatory enforcement.

247.    The Due Process Clause of the Fourteenth Amendment prohibits the government from employing vague or overbroad statutory language in a way that deprives persons of fair notice of the law's scope and allows for arbitrary and discriminatory enforcement.

248.    EOLO nowhere defines what it means to "deploy misinformation to obstruct."

63

249. The statutory phrase "deploy misinformation to obstruct" is vague and overbroad such that it deprives Plaintiffs and others of fair notice of the law's scope and allows for arbitrary and discriminatory enforcement.

250. EOLO defines "assisted suicide" contrary to its ordinary meaning in a way that deprives health care providers and others of fair notice of the law's scope and allows for arbitrary and discriminatory enforcement.

251. EOLO provides that helping someone kill himself or herself with use of drugs is "medical aid in dying" and does not constitute "assisted suicide"—nor, according to EOLO, does it constitute "euthanasia, mercy killing, homicide, murder, manslaughter, elder abuse or neglect . . . ."

252. The traditional, ordinary, common-sense, and self-evident meaning of "assisted suicide" is assisting or aiding another person to kill himself or herself.

253. Illinois law elsewhere criminalizes "inducement to commit suicide." 720 ILCS 5/12-34.5(a)(2).

254. Illinois's "Inducement to commit suicide statute" provides in part that a person commits the crime of "inducement to commit suicide when he or she . . . [w]ith knowledge that another person intends to commit or attempt to commit suicide, intentionally (i) offers and provides the physical means by which another person commits or attempts to commit suicide, or (ii) participates in a physical act by which another person commits or attempts to commit suicide." *Id.*

255. EOLO provides that actions taken under EOLO do not constitute "any other civil or criminal violation under the law," but the "Inducement to commit suicide" statute has not been

repealed and EOLO does not specify that actions taken under EOLO do not constitute "inducement to commit suicide."

256.    Plaintiffs are deprived of fair notice of EOLO's and HCRCA's scope.

257.    For example, Plaintiffs do not have fair notice as to whether the expression of their beliefs about assisted suicide in communicating with patients, and even Plaintiffs' use of the term "assisted suicide" itself, is supposed "misinformation to obstruct" or "intentionally misleading" information in violation of the law.

258.    The statutes allow for arbitrary and discriminatory enforcement.

259.    The Lutheran Care Center, the Catholic hospitals under Bishop Paprocki's authority, and the physician Plaintiffs maintain close relationships with their current and prospective terminally ill patients, who are not readily identifiable or able to assert their own rights in a timely fashion.

260.    In depriving Plaintiffs and others of fair notice of the law's scope and allowing for arbitrary and discriminatory enforcement, EOLO and HCRCA violate due process.

261.    Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count V**
**(by Lutheran Care Center and Bishop Paprocki)**
**42 U.S.C. § 1983**
**Violation of the Church Autonomy Doctrine Under the First Amendment**

262.    All preceding paragraphs are incorporated by reference.

263.    The church autonomy doctrine under the First Amendment protects the freedom of religious organizations to decide for themselves, free from state interference, matters of internal governance as well as faith and doctrine, including deciding how to avoid participating in and cooperating with physician-assisted suicide.

65

264. EOLO and HCRCA implicate matters of religious-organization governance that must be respected by civil courts.

265. As a matter of governance, faith, and doctrine as a religious entity, the Lutheran Care Center and Bishop Paprocki are committed to avoiding participation in and cooperation with assisted suicide.

266. EOLO and HCRCA unconstitutionally intrude on these matters of internal religious-organization governance, faith, and doctrine by making it impossible for the Lutheran Care Center to operate according to its religious mission, and for Bishop Paprocki to ensure Catholic hospitals in his diocese do the same.

267. For example, selecting health care practitioners who align with and carry out the Lutheran Care Center's and Catholic hospitals' religious missions and witness to every patient is a matter of internal church governance. Requiring these entities to mandate or allow their health care personnel to promote or participate in assisted suicide directly interferes with that internal governance.

268. Additionally, Bishop Paprocki has the "ultimate responsibility" for applying the Catholic ERDs in his Diocese, and he has issued a General Decree rendering the ERDs' latest edition "particular" law within his jurisdiction. However, by requiring even objecting hospitals to facilitate assisted suicide, EOLO directly interferes with Bishop Paprocki's internal church governance in ensuring Catholic hospitals in his diocese treat patients in accord with the healing ministry of Christ and thus in compliance with the Catholic ERDs.

269. EOLO and HCRCA violate the Lutheran Care Center's and Bishop Paprocki's rights secured to them under the church autonomy doctrine by exposing them to substantial liability simply for practicing their well-established religious beliefs.

66

270. The Lutheran Care Center and Bishop Paprocki will suffer irreparable harm absent declaratory and injunctive relief.

**Count VI**
**(by all Plaintiffs)**
**42 U.S.C. §§ 12131–12133**
**Violation of Federal Americans with Disabilities Act**

271. All preceding paragraphs are incorporated by reference.

272. Title II of the Americans with Disabilities Act (ADA) states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

273. A "public entity" includes State and local governments, their agencies, and their instrumentalities. *Id.* § 12131(1).

274. The ADA defines a qualified individual with a disability as a person who has "a physical or mental impairment that substantially limits one or more major life activities," including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," 42 U.S.C. § 12102(1)(A), (2)(A).

275. "[M]ajor life activit[ies]" also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

276. Discrimination occurs when, among other things, disabled people are offered services that are "not equal to" those provided to others, 28 C.F.R. § 35.130(b)(1)(ii), or are less effective, *id.* § 35.130(b)(1)(iii).

67

277. Many of Plaintiffs' patients who receive terminal diagnoses are qualified individuals with disabilities under the ADA.

278. Illinois previously provided all individuals at risk of suicide with certain legal protections and resources. Defendants' statutory scheme of requiring Plaintiffs to target terminally ill patients with disabilities with information about and the option of suicide, and to not provide them with the traditional protections provided to those nondisabled individuals at risk of suicide, amounts to discrimination against their terminally ill patients under the ADA.

279. Plaintiffs maintain close relationships with their current and prospective terminally ill patients, who are not readily identifiable or able to assert their own rights in a timely fashion.

280. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

**Count VII**
**(by the Lutheran Care Center and Bishop Paprocki)**
**Violation of the Supremacy Clause – Conflict with Federal Assisted Suicide Funding Restriction Act**

281. All preceding paragraphs are incorporated by reference.

282. The Supremacy Clause of the United States Constitution provides that federal law is "the supreme Law of the Land …, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

283. The federal Assisted Suicide Funding Restriction Act prohibits the use of federal health care funds "to provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide." 42 U.S.C. § 14402(a)(1).

284. Plaintiffs bring this Count in equity, invoking the long-recognized power of federal courts to enjoin state officials from enforcing state laws that conflict with federal law. *Ex parte Young*, 209 U.S. 123 (1908); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

285. The Lutheran Care Center and the Catholic hospitals under Bishop Paprocki's authority receive some federal health care funds.

286. EOLO and HCRCA compel the Lutheran Care Center and Catholic hospitals to violate that ban by directly funding services that facilitate assisted suicide, including but not limited to informing patients of the alleged "benefits" of assisted suicide as a possible "treatment option," and to "refer" for or "transfer" to assisted suicide professionals.

287. It would be impossible for the Lutheran Care Center and the Catholic hospitals under Bishop Paprocki's authority to separate facilitation of assisted suicide from the care they currently provide, since EOLO and HCRCA mandate that facilitation of assisted suicide is integral to and inseparable from the patient's overall so-called "fully informed" care.

288. It is impossible for the Lutheran Care Center and the Catholic hospitals under Bishop Paprocki's authority to comply with both their state-law duty to facilitate assisted suicide and their federal-law duty to not facilitate assisted suicide.

289. Accordingly, EOLO and HCRCA are pre-empted.

290. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent declaratory and injunctive relief.

### Count VIII
**(by all Plaintiffs)**
**Violation of the Supremacy Clause – Conflict with Federal Affordable Care Act**

291. All preceding paragraphs are incorporated by reference.

292. The Affordable Care Act (ACA) provides that "any State … that receives Federal financial assistance … may not subject an individual or institutional health care entity to discrimination on the basis that the entity does not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, such as by assisted suicide, euthanasia, or mercy killing." 42 U.S.C. § 18113(a).

293. The State of Illinois receives federal financial assistance within the meaning of the ACA.

294. Plaintiff physicians, the Lutheran Care Center, and the Catholic hospitals under Bishop Paprocki's authority are either individuals or institutional health care entities for purposes of the ACA.

295. Plaintiffs bring this Count in equity to enjoin enforcement of a preempted state law. *Ex parte Young*, 209 U.S. 123 (1908); *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). EOLO's own text concedes the primacy of these federal funding conditions: § 65(h) makes any conflicting part of § 65 "inoperative solely to the extent of the conflict." 410 ILCS 22/65(h).

296. Under EOLO and HCRCA, Illinois discriminates against Plaintiffs on the basis that they do not provide any health care item or service furnished for the purpose of causing, or for the purpose of assisting in causing, the death of any individual, in conflict with the ACA.

297. Accordingly, EOLO and HCRCA are pre-empted.

298. Plaintiffs and the current and prospective patients they serve will suffer irreparable harm absent injunctive relief.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask this Court to:

1. Issue a temporary restraining order, preliminary injunction, and permanent injunction restraining and enjoining Defendants, their officers, agents, employees, attorneys, and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with EOLO and the HCRCA, on their face and/or as applied to Plaintiffs, barring Defendants from enforcing EOLO and HCRCA's requirements to:

   a. Inform patients of the so-called "benefits" of medical "aid in dying"—i.e., physician-assisted suicide—or that assisted suicide is otherwise a legitimate treatment option;

   b. Refer or transfer individuals to, or provide them written information about, other health care professionals or health care facilities that are "able and willing to evaluate and qualify" them for assisted suicide, or other third parties to "assist" individuals in obtaining assisted suicide, or health care practitioners whom they "reasonably believe may offer" assisted suicide;

   c. Refrain from "intentionally misleading" individuals, "deploying misinformation to obstruct access to" assisted suicide, or otherwise "unduly influencing" or "coercing" individuals to not obtain assisted suicide by counseling them about their end-of-life care options in a manner that does *not* include assisted suicide; by counseling them on the difference between "assisted suicide," "suicide," or "euthanasia" and end-of-life care such as palliative care and hospice; or by encouraging them to choose end-of-life care other than "assisted suicide," "suicide," or "euthanasia";

   d. Note in individuals' medical records their requests for assisted suicide and the health care professionals' inability to carry out such request, as a predicate for starting the assisted suicide qualifying process with another practitioner;

e. Sign death certificates attributing the death of a qualified patient who obtained and self-administered a prescription substance pursuant to EOLO to the underlying terminal disease without indicating on the death certificate the patient's act of self-administering a substance prescribed pursuant to EOLO; and

f. Adopt written access to care and information protocols that require any of the speech or other actions described in paragraphs (a)-(e).

2. Declare that EOLO and HCRCA violate, on their face and/or as applied to Plaintiffs, the First Amendment, Fourteenth Amendment, 42 U.S.C. § 14402(a)(1), 42 U.S.C. § 18113(a), and the Americans with Disabilities Act;

3. Award Plaintiffs nominal damages;

4. Award Plaintiffs attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

5. Relieve Plaintiffs from posting any bond; and

6. Award such other relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

THOMAS MORE SOCIETY

/s/Peter Breen
/s/Michael McHale
/s/Thomas Brejcha
Thomas Brejcha (ARDC # 0288446)
Peter Breen (ARDC # 6271981)
Michael G. McHale (NE Bar # 24949)[*]
Mary Catherine Martin (ARDC # 6284887)[†]
THOMAS MORE SOCIETY
121 West Wacker Drive, Suite 650
Chicago, Illinois 60601
(312) 782-1680
tbrejcha@thomasmoresociety.org

72

pbreen@thomasmoresociety.org
mmchale@thomasmoresociety.org
mcmartin@thomasmoresociety.org

Adam S. Hochschild (MO Bar # 52282)‡
Hochschild Law Firm, LLC
P.O. Box 401
Plainfield, VT 05667
(314) 503-0326
adam@hochschildlaw.com

*Counsel for All Plaintiffs*

\* *Licensed solely in Nebraska*
† *Admission forthcoming*
‡ *Pro hac vice forthcoming*